**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

E. DALE ZEPP,
Plaintiff-Appellant,

v.

EILEEN M. REHRMANN, Individually
and in her official capacity of
County Executive for Harford
County; ERNEST CROFOOT,

individually and in his capacity as
County Attorney for Harford
County; HARFORD COUNTY,
MARYLAND, a body politic and
political subdivision of the State of
Maryland,
Defendants-Appellees.

No. 95-1379

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-94-1558-WN)

Argued: November 2, 1995

Decided: March 26, 1996

Before NIEMEYER and HAMILTON, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Hamilton and Senior Judge Phillips joined.

_____

**COUNSEL**

**ARGUED:** Michael Dwayne Smigiel, Sr., Elkton, Maryland, for
Appellant. Jefferson Lee Blomquist, HARFORD COUNTY
DEPARTMENT OF LAW, Bel Air, Maryland, for Appellees.

_____

**OPINION**

NIEMEYER, Circuit Judge:

When an inmate at the Harford County (Maryland) Detention Cen-
ter was found dead in his cell from strangulation, his family accused
Harford County deputy sheriffs of sodomizing and murdering him.
Faced with the threat of a lawsuit by the inmate's family against Har-
ford County, its sheriff, and their employees, the County demanded
the resignation of Major E. Dale Zepp, the deputy sheriff in charge
of the Detention Center, and threatened not to represent him in any
civil suit relating to the inmate's death unless Zepp resigned or
retired. After the Sheriff agreed to Zepp's request for a two-week
reassignment, use of annual leave, and a ban on negative publicity,
Zepp stated that he would retire following his annual leave. Harford
County thereafter reached a settlement with the inmate's family, and,
in publicly announcing the settlement, the County Executive stated
that Zepp was being forced to retire "due to management problems."
One-and-one-half months later, Zepp formally tendered his resigna-
tion and, on June 30, 1993, retired.

Almost a year after his retirement, Zepp sued Harford County, the
County Executive, and the County Attorney, alleging, <u>inter alia</u>, vio-
lations of his Fourteenth Amendment rights under 42 U.S.C. § 1983.
Specifically, Zepp claimed that the defendants had coerced him to
retire and had defamed him, thereby denying him his property interest
in continued employment as a deputy sheriff and his liberty interest
in his reputation, both without due process of law. The defendants
filed a motion for summary judgment, which the district court
granted.

Because we conclude that (1) Zepp's claims against Harford
County and its employees in their official capacities do not allege any

2

violation of county law or policy to establish municipal liability under 42 U.S.C. § 1983 and (2) Zepp's § 1983 claims against the Harford County Executive and the County Attorney individually are barred by qualified immunity, we affirm.

I

On March 1, 1992, William Ford, an inmate at the Harford County Detention Center, was found dead on his cot in the booking room holding cell. He was lying face down with a pillowcase tied tightly around his neck. The County ruled the death a suicide, but Ford's family suspected that his death was the result of "foul play" by deputy sheriffs at the Detention Center and retained an attorney to pursue a civil lawsuit against the County, the County Sheriff, and his deputies. The Ford family's attorney prepared a proposed complaint and presented it to the County.

After investigating the charges, Harford County Attorney Ernest Crofoot concluded that there was civil liability exposure and opened settlement negotiations with the Ford family. During those negotiations, the Ford family indicated that it held Deputy Zepp personally responsible for covering up Ford's murder and that it wished to see changes made at the Detention Center. The family also represented that it would not relinquish its right to sue Zepp personally if he remained in charge of the Detention Center.

Responding to the Ford family's demand, Harford County Executive Eileen Rehrmann and County Attorney Crofoot determined that Zepp would have to resign or retire, and Crofoot so advised Harford County Sheriff Robert E. Comes on April 13, 1993. Crofoot told Comes that if Zepp did not retire, the County would not represent either Zepp or Comes in any suit relating to Ford's death, even though the Deputy County Attorney had told Zepp a week earlier that the County would defend him under an agreement with the Maryland Attorney General's Office. Sheriff Comes related that information to Zepp and speculated that a legal defense could cost from $40,000 to $60,000.

Later on April 13, 1993, at a meeting with Comes and Zepp, Crofoot reiterated the County's position, and, at the end of that meeting,

3

Zepp stated that he would retire if necessary to protect his family and assets. He indicated that if he were permitted to be reassigned for a period of two weeks, he would thereafter use accumulated annual leave and retire, effective June 30, 1993. Zepp also demanded no adverse publicity. Immediately after the April 13 meeting with Crofoot and Comes, Zepp retained Stuart Robinson, an attorney, to represent him in the pending criminal investigation arising out of the Ford case and "to look into the County's settlement with the Ford estate."

Three days after Zepp indicated he would retire, County Attorney Crofoot reached a final settlement agreement with the Ford estate. The County paid the estate $400,000, and the estate executed a "Release and Settlement of Claim," relinquishing all claims against Harford County, its officers and employees, as well as the Sheriff and his deputies, including Zepp, but specifically reserving claims against three individuals not disclosed in the release. After the agreement had been executed, County Executive Rehrmann announced the settlement in a televised newscast, stating that "due to management problems at the Harford County Detention Center, highlighted by the Ford case, Major E. Dale Zepp [is] being forced to retire."

Following the settlement with the Ford estate, Zepp was reassigned for two weeks, as agreed. On May 1, 1993, he began using his accumulated annual leave, and on June 1, 1993, he tendered his formal notice of retirement, effective June 30, 1993.

Before Zepp's retirement, his attorney, Robinson, wrote the County Attorney to request a copy of the investigation into Ford's death because he understood that there was a "difference of opinion" about the facts of the case that "may or may not play a significant role in this matter, particularly in talking about settlement/suit/continuing investigation options." Robinson also wrote to a state government attorney investigating the matter:

> Since my client is a party on whose behalf a settlement has been reached, it is only appropriate that he be given a copy of that document. Time is of the essence in that my client is scheduled for retirement on June 30, 1993, and would like this document prior to retirement.

4

On June 30, 1993, Zepp retired after serving as a deputy in the sheriff's office for over 30 years.

In June 1994, Zepp filed this action against Harford County, County Executive Rehrmann, and County Attorney Crofoot. Zepp's complaint contained federal constitutional and state law claims based on his allegations that (1) he had been coerced into retirement and (2) the County Executive had defamed him by stating that he had been forced to retire "due to management problems at the Harford County Detention Center." The defendants filed a motion for summary judgment, contending that Zepp had failed as a matter of law to establish infringements of his constitutional rights. The individual defendants also asserted qualified immunity.

The district court granted the defendants' motion for summary judgment, concluding that Zepp had retired voluntarily and had no constitutionally protected interest in his reputation. The court also declined to exercise jurisdiction over Zepp's state law claims, dismissing them without prejudice. This appeal, which challenges only the court's ruling on the § 1983 claims, followed.

II

Zepp does not articulate his constitutional tort claims against Harford County or the individual defendants in their <u>official</u> capacities separately from his allegations of individual liability directed at the County Executive and the County Attorney. Thus, while Zepp argues that the County Executive and the County Attorney were instrumental in coercing him to retire, he does not identify a violation of any Harford County policy, ordinance, regulation, or decision. Because municipal liability cannot rest on the doctrine of respondeat superior, Zepp's § 1983 claims against Harford County and the defendants in their official capacities must fail. <u>See Monell v. Department of Social Services</u>, 436 U.S. 658, 691 (1978); <u>Greensboro Professional Fire Fighters Ass'n, Local 3157 v. City of Greensboro</u>, 64 F.3d 962, 964 (4th Cir. 1995). Zepp's claim that the County Executive and the County Attorney instigated his coercive retirement, therefore, can only be made against them in their individual capacities, if at all.*

_____

*The County also contends that as a matter of law, neither Harford County nor any of its officials could have constructively discharged Zepp

5

III

With respect to Zepp's constitutional tort claims against County Executive Rehrmann and County Attorney Crofoot individually, we address, as a threshold matter, their qualified immunity defense. See Torcasio v. Murray, 57 F.3d 1340, 1352 (4th Cir. 1995), cert. denied, 116 S. Ct. 772 (1996). In doing so, we resolve "the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." Siegert v. Gilley, 500 U.S. 226, 233 (1991) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). To determine whether a federal right was clearly established at the time of the defendants' alleged conduct, we focus "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992).

A

In this case, the principal constitutional issue that Zepp presents is whether, in seeking a settlement with the Ford family and pressing Zepp to resign his position as deputy sheriff, the County Executive and the County Attorney deprived Zepp of his constitutionally protected property interest in continued employment. While Zepp contends that the County officials' pressure amounted to an illegal constructive discharge, he alleges facts that are no more indicative of

_____

because they were not his employer. The Sheriff of Harford County is a state officer, see Md. Const. art. IV, § 44; Md. State Gov't Code Ann. § 12-101(6); Rucker v. Harford County, 558 A.2d 399, 402 (Md. 1989), and deputy sheriffs are employed by the sheriff, not by the county, see id.; Md. Cts. & Jud. Proc. Code Ann. § 2-309(n), (z); Boyer v. State, 594 A.2d 121, 128 (Md. 1991). Furthermore, the dismissal of a deputy is governed by state law, not Harford County law. See Md. Ann. Code art. 27, §§ 727-734D (Law Enforcement Officers' Bill of Rights). But because the employment status of a deputy sheriff under Maryland law does not compel the conclusion that Zepp was a state employee for purposes of his constructive discharge claims under § 1983, see Dotson v. Chester, 937 F.2d 920, 926 (4th Cir. 1991), we choose not to rest our decision in this case on any particular characterization of Zepp's employment status.

6

a constructive discharge than those involved in Stone v. University of Maryland Medical System. Corp., 855 F.2d 167 (4th Cir. 1988), a decision that articulated the law of this circuit when Zepp resigned. See also Shealey v. Winston, 929 F.2d 1009 (4th Cir. 1991) (applying Stone analysis and concluding that plaintiff had failed to present factual issue as to voluntariness of his retirement). Thus, Stone forecloses Zepp's assertion that the County Executive and the County Attorney violated a well established right when they requested his resignation.

In Stone, a state-employed surgeon agreed to resign several hours after his superiors informed him that if he did not, the Medical Examination Committee, which was scheduled to meet later that afternoon, would suspend his clinical privileges and commence proceedings for his removal. Id. at 170-71. Before tendering his resignation, Stone demanded, and received, assurances that his resignation would go on record as having been voluntary, that the effective date of his resignation would be delayed, and that he would continue to receive his salary until his resignation became effective. Id. at 171. Five months later, Stone brought a § 1983 suit, alleging that he had been constructively discharged in violation of his Fourteenth Amendment due process rights. Id.

We recognized in Stone that a resignation may amount to a constructive discharge in two general circumstances:"(1) where obtained by the employer's misrepresentation or deception, and (2) where forced by the employer's duress or coercion." Id. at 174 (citations omitted). "Under the `misrepresentation' theory," we explained, "a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation." Id. And a resignation may be deemed involuntary under the "duress/coercion" theory "if on the totality of circumstances it appears that the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter." Id. The facts surrounding Stone's retirement, however, failed to persuade us that the surgeon had been constructively discharged under either the misrepresentation theory or the duress/coercion theory.

Stone argued that his resignation had been induced by his superiors' misrepresentation that they would discharge him from the medi-

7

cal staff if he did not resign immediately. Id. at 175. We recognized that even if his superiors' threat constituted a material misrepresentation of fact, Stone's sophistication in administrative matters and the ease with which he could have ascertained his rights made it "simply incredible that a person situated as was Stone could reasonably have accepted the asserted misrepresentation and resigned on that basis." Id. at 176.

We also rejected Stone's contention that his resignation had been coerced. Stone, a well-educated and experienced hospital administrator, had been fully informed of the charges against him. Id. at 177. He also "knew what his rights were, and if he did not, he was given ample time to find out," to contact an attorney, and to seek the advice of anyone he wished. Id. Moreover, Stone "drove a hard bargain" in dictating the terms of his resignation and did not make any effort to rescind his resignation or request a hearing on the charges against him during the five months between his decision to resign and the filing of his lawsuit. Id. at 177-78. "[T]he mere fact that Stone was forced to choose between the inherently unpleasant alternatives of resignation and possible termination for cause [did] not itself mean that his resignation was submitted under duress, absent evidence that his superiors lacked good cause for the threatened termination." Id. at 177.

In this case, Zepp argues that he relied on the individual defendants' "misrepresentation" that Harford County would not represent him in any civil case relating to Ford's death if he refused to resign. We cannot discern how the County's stated refusal to represent Zepp could be deemed a misrepresentation of material fact. The statement was one of future intent, not of existing fact. Moreover, the County had no legal obligation to represent Zepp, and Zepp has not presented any evidence to suggest that the County Attorney spoke for the Maryland Attorney General, who was responsible for representing Zepp. See Md. State Gov't Code Ann. §§ 12-304(a)(1), 12-101(6).

Moreover, Zepp could not have reasonably relied on the defendants' purported misrepresentations. Like Stone, Zepp was not a naive employee; he was a high-ranking deputy sheriff with over 30 years experience. And Zepp could easily have ascertained his legal rights before formally tendering his resignation or before it became

8

effective; he had more than two months to do so. Indeed, on the very day that he stated he would retire, Zepp retained Robinson to represent him in the pending criminal investigation and to look into the County's settlement with the Ford estate. Yet, over the following months, Zepp never wavered from his decision to resign or sought to invoke the hearing process that was available for involuntary terminations.

We also find untenable Zepp's duress/coercion theory of his constructive discharge. As already noted, Zepp was a high-ranking, experienced deputy sheriff. Also like Stone, Zepp demanded and received several accommodations before agreeing to retire. He was permitted to work on a reassigned basis for two weeks and to use his accumulated annual leave, thereby postponing the effective date of his retirement for two-and-one-half months. Finally, Zepp, like Stone, never indicated any desire to rescind his resignation before it became effective. On the contrary, one-and-one-half months after he stated he would resign, he formally submitted his resignation in writing. During the time between the April 13 meeting and his June 30 retirement, Zepp had the opportunity to consult with his legal counsel and to review the settlement that the County had negotiated with the Ford estate. Instead of challenging Zepp's decision to resign, Zepp's counsel appears to have endorsed it by asking for a copy of the settlement agreement before Zepp's retirement to assure himself that it protected Zepp.

Zepp was given a choice, albeit an unpleasant one. He could refuse to resign, demand that he be given a hearing if he were to be fired, and insist upon legal representation in any future cases arising out of Ford's death, despite the County Attorney's position that the County would not represent him. Or Zepp could resign and receive a release from liability to the Ford estate. Zepp elected to resign, receiving significant concessions from the County concerning the conditions of his resignation and a complete release from civil liability without any financial contribution on his part.

The conduct that Zepp attributes to the County Executive and the County Attorney in pressing for his retirement is not even as aggressive as that conduct found to fall short of violating a federal right in

9

Stone. And Zepp has advanced no case that would, at the time of his retirement, give him a well-established federal right to relief.

In ruling on the defendants' qualified immunity defense, we need only decide whether the rights that Zepp asserts were "clearly established in a particularized and relevant sense" so that the unlawfulness of the defendants' conduct would have been "apparent" in light of existing law. Pinder v. Johnson, 54 F.3d 1169, 1173 (4th Cir.) (en banc), cert. denied, 116 S. Ct. 530 (1995). In this case, Harford County was facing a serious charge that its chief legal officer considered sufficiently viable to settle for $400,000. The allegations of mismanagement at the Harford County Detention Center were plausible in light of what was known about Ford's death, and Zepp was the deputy sheriff in charge of the Detention Center. If mismanagement was a contributing cause of Ford's death, the County Executive and County Attorney had a reasonable interest in settling the Ford family's claim with an agreement to seek Zepp's resignation or retirement, even if only the Sheriff could fire Zepp. Given the totality of circumstances surrounding Zepp's resignation and our decision in Stone, we conclude that it was not "apparent" that the defendants' conduct violated a clearly established federal right and, therefore, that qualified immunity shields the Harford County Executive and County Attorney from Zepp's § 1983 claims for constructive discharge in violation of his Fourteenth Amendment due process rights.

B

Zepp also contends that he was deprived of a constitutionally protected liberty interest in his reputation when the County Executive represented on television that Zepp was being forced to retire because of management problems at the Harford County Detention Center. Again, however, Zepp's claim is not founded on any clearly established principle of federal law. Both the Supreme Court and this court have consistently held that public employees' liberty interests are not implicated by harm to reputation alone. See, e.g., Paul v. Davis, 424 U.S. 693, 706 (1976); Wagner v. Wheeler, 13 F.3d 86, 92-93 (4th Cir. 1993); Stone, 855 F.2d at 172 n.5. "Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." Siegert, 500 U.S. at 233. To implicate a constitutionally protected liberty interest, defamatory statements must at least "imply

10

the existence of serious character defects such as dishonesty or immorality," see Robertson v. Rogers, 679 F.2d 1090, 1092 (4th Cir. 1982), "that might seriously damage [the plaintiff's] standing and associations in his community" or "foreclose[] his freedom to take advantage of other employment opportunities." Board of Regents v. Roth, 408 U.S. 564, 573 (1972) (dictum). In Robertson, we held that statements that the plaintiff had been fired for "incompetence and outside activities" did not impose on the plaintiff a stigma or disability sufficient to implicate a constitutionally protected liberty interest. 679 F.2d at 1092.

In this case, the County Executive, in announcing the settlement agreement in a televised newscast, stated that "due to management problems at the Harford County Detention Center," Zepp was being "forced to retire." The most that Zepp can derive from this statement is that the County Executive accused him of incompetence or unsatisfactory job performance. Such accusations, however, did not violate any clearly established federal right.

Accordingly, we affirm the district court's summary judgment in favor of the defendants on Zepp's § 1983 claims.

AFFIRMED

11