**IVY HALL GERIATRIC AND RE-
HABILITATION CENTER,
INC., Plaintiff,**

v.

**Donna SHALALA, et al., Defendants.**

**No. Civ. AMD 98–2666.**

United States District Court,
D. Maryland.

May 25, 1999.

448

Paul Walter, Ferrier Rose Stillman, Tydings & Rosenberg, Baltimore, MD, for plaintiff.

Lynne A. Battaglia, U.S. Attorney, Baltimore, MD, Sheila Leiber, Brian G. Kennedy, Dept. Of Justice, Civil Division,

Washington, DC, Wendy A. Kronmiller, Assistant Attorney General, Baltimore, MD, for defendant.

## MEMORANDUM

DAVIS, District Judge.

## I. INTRODUCTION

Ivy Hall Geriatric and Rehabilitation Center, Inc.("Ivy Hall"), a provider of nursing home services, has sued Donna Shalala, the Secretary of the Department of Health and Human Services, ("HHS"), Nancy–Ann Min Deparle, the Director of the federal Health Care Financing Administration, ("HCFA") (together, the "federal defendants"), and Dr. Georges C. Benjamin,[1] Secretary of Maryland's Department of Health and Mental Hygiene ("DHMH"), all in their official capacities only. Ivy Hall alleges, *inter alia*, that its constitutional rights were violated by the promulgation by the federal defendants and the enforcement by the state defendant of regulations that set forth the criteria for the inspection of nursing homes and that effectuate Congress's statutory command providing for the automatic revocation of nurse aide training and competency evaluation programs, ("NATCEPs") under certain enumerated circumstances. In sum, Ivy Hall contends that the financial impact on the profitability its business from even the temporary loss of its NATCEP compels the conclusion that the Due Process Clause requires a full-blown adversarial hearing before its training program can be shuttered by governmental enforcement action.

Jurisdiction unquestionably exists under 5 U.S.C.A. § 702, 28 U.S.C.A. §§ 1331, 1343 and 42 U.S.C.A. § 405(g).[2] Pending before the court are the parties' cross motions for summary judgment.[3] I have thoroughly considered the parties' submissions and the parties have presented oral argument. For the reasons set forth below, I am persuaded that the process afforded Ivy Hall in its efforts to challenge the particular adverse governmental action resulting in the decertification of its training program comports with minimum constitutional requirements. I will therefore grant the defendants' motions for summary judgment and deny Ivy Hall's cross motion for partial summary judgment.

## II. FACTS

### A. Statutory and Regulatory Background

Ivy Hall is a skilled nursing facility ("SNF"). An SNF is an institution "primarily engaged in providing to residents (A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, and is not primarily for

1. Ivy Hall initially named Dr. Martin P. Wasserman as a defendant. Dr. Wasserman resigned as Secretary and Dr. Benjamin assumed the position on May 1, 1999. Pursuant to Fed.R.Civ.P. 25(d), Dr. Benjamin has been substituted as a party defendant.

2. Ivy Hall's complaint seeks the following relief in five distinct claims: (1) an order requiring HHS and HCFA to hold an administrative hearing so that Ivy Hall can contest DHMH's findings; (2) an order setting aside the following regulations and declaring them unconstitutional on their face and as applied to Ivy Hall: 42 C.F.R. §§ 488.408, 488.301, 488.331, 498.3(b)(12), 498.3(d)(11), 408.406 and 488.408(g)(1); (3) a declaratory judgment that DHMH unconstitutionally pursued a policy and custom applying 42 C.F.R. §§ 488.408, 488.301 and 488.331; (4) an order setting

aside the determination that Ivy Hall provided "substandard quality of care;" (5) damages; and (6) attorney's fees and costs. Because I am persuaded that, as applied to Ivy Hall, the regulatory regime established and implemented by the joint action of the federal and state officials before the court effected no deprivation of liberty or property without due process of law or of equal protection, I need not explore nettlesome issues related to monetary recovery or facial constitutionality.

3. Ivy Hall's motion only seeks partial summary judgment on its claim that the revocation of its NATCEP violated its rights of due process and equal protection under the Constitution. Both federal and state defendants move for summary judgment as to all dispositive issues.

the care and treatment of mental diseases...." 42 U.S.C.A. § 1395i–3(a) (West Supp.1999). Consequently, Ivy Hall's participation in the Medicare and Medicaid programs is governed by a complex statutory and regulatory regime. *See generally* 42 U.S.C.A. §§ 1395i–3, *et seq.* & 1396r, *et seq.*

The consequences of non-compliance with the general Medicare and Medicaid rules and regulations, and the related regulations addressing NATCEPs, are implicated in this dispute.[4] Because an SNF can use, on a full-time basis, only a nurse aide who has completed a "training and competency evaluation program, or a competency evaluation program, approved by the State ...," 42 U.S.C.A. § 1395i–3(b)(5)(A); *see also* 42 U.S.C.A. § 1396r(b)(5)(A) (parallel provision in the Medicaid statute), regulations addressing NATCEPs are quite significant. For some nursing facilities the in-house operation of a NATCEP (as a source of labor for low-paying clinical functions critical to efficient patient care) is important to the profitability of the nursing facility. This is especially true for SNFs, such as Ivy Hall, located in areas having poor access to public transportation, because such areas are less desirable workplaces for members of the relevant labor pool, who often lack personal transportation.

A NATCEP must include a minimum number of hours of classroom and clinical training. It must cover identified areas of specialized care, such as basic nursing skills and "care of cognitively impaired residents." 42 U.S.C.A. §§ 1395i–3(f)(2)(A); 42 U.S.C.A. § 1396r(f)(2)(A). *See also* 42 C.F.R. § 483.152. A NATCEP

will not be approved, however, even if it meets the basic curriculum requirements, if within the preceding two years, the facility in which it is operated "(a) has operated under a waiver ... (b) has been subject to an extended (or partial extended survey) ... or (c) has been assessed a civil money penalty." 42 U.S.C.A. §§ 1395i–3(f)(2)(B); 1396r(f)(2)(B). *See also* 42 C.F.R. § 483.151(b)(2) (same); 42 C.F.R. § 483.151(b)(3) (prohibiting approval of a NATCEP if the facility had its Medicare or Medicaid participation terminated, was assessed a civil money penalty, operated under temporary management or was closed by the government).

Separate and apart from specific regulations in respect to the content of a NATCEP, Congress has mandated, as an incentive to SNFs to remain in compliance with Medicare and Medicaid requirements, that "each skilled nursing facility shall be subject to a standard survey, to be conducted without any prior notice to the facility." 42 U.S.C.A. §§ 1395i–3(g)(2)(A); 1396r(g)(2)(A).[5] If, during this "standard" survey, a facility is found to have provided "substandard quality of care,"[6] it will be subject to an "extended survey," which must take place immediately after the standard survey, and in any event, no later than two weeks afterwards. *See* 42 U.S.C.A. §§ 1395i–3(g)(2)(B); 1396r(g)(2)(B). HCFA and its state counterparts have the authority to impose sanctions if a facility is not in substantial compliance with relevant regulations after a survey. The available sanctions include the termination of a facility's provider agreement, the installation of temporary

---

4. The regulations pertaining to SNFs became effective in 1995, pursuant to the Medicare and Medicaid amendments included in the 1987 Omnibus Budget Reconciliation Act.

5. The regulations discuss the content and procedure of these surveys in detail. *See generally* 42 C.F.R. § 488.110 (delineating tasks for survey members, discussing the constituent members of the survey team, and listing examples of possible questions and subject matter).

6. "Substandard quality of care" is defined as "one or more deficiencies related to participation requirements, resident behavior and facility practices, quality of life, or quality of care which constitute either immediate jeopardy to resident health or safety; a pattern of or widespread actual harm that is not immediate jeopardy; or a widespread potential for more than minimal harm, but less than immediate jeopardy, with no actual harm." 42 C.F.R. § 488.301 (internal citations to the C.F.R. omitted).

management, the denial of payment for new admissions, assessment of civil money penalties, the closure of the facility and state monitoring. *See* 42 C.F.R. § 488.406(b). *These remedies are in addition to the automatic suspension of a facility's NATCEP upon the imposition of an extended survey.*

Thus, the gravamen of Ivy Hall's complaint lies in this: a facility has the right to a hearing and to subsequent appeals if government regulators impose almost any of the remedies available to them. However, a facility has no right to a formal hearing if, upon a finding triggering an extended survey, the sole remedy is "the loss of the approval for a nurse-aide training program." 42 C.F.R. §§ 498.3(d)(10) & (11). *See also* § 488.408(g) ("A facility may not appeal the choice of remedy, including the factors considered by HCFA or the State in selecting the remedy. . . ."). In lieu of a hearing (including appellate review), a state "must offer a facility an informal opportunity, at the facility's request, to dispute survey findings upon the facility's receipt of the official statement of deficiencies." 42 C.F.R. § 488.331(a)(1). Thus, a facility's sole means of redress for a revocation of a NATCEP (if that is the only remedy imposed) is by resort to the informal dispute resolution process ("IDR"). *See* 59 Fed.Reg. 56, 229. Ivy Hall contends that this fails to comport with due process.

HCFA has published a so-called State Operations Manual ("SOM") to describe the survey process and informal dispute resolution in further detail. The SOM explains that "the NATCEP must be denied or withdrawn when an extended or partial survey is conducted." SOM § 7210(G). An opportunity for informal dispute resolution must be provided to the facility, although such opportunity need not include a face-to-face meeting. *See* SOM § 7212. "States are encouraged to include in the IDR process at least one person as part of the decision making process who was not directly involved in the survey." *Id.* The SOM allows as a part of the IDR a facility's challenge to the "scope and severity [of] assessments that constitute substandard quality of care or immediate jeopardy." *Id.*

## B. The Ivy Hall Facility Loses Its NATCEP

Since 1947, Ivy Hall has owned and operated a 120 bed SNF which provides care to individuals requiring assistance in performing many daily life activities, such as bathing, eating and dressing. It has trained certified nurse aides since 1977; as of 1997, 50% of Ivy Hall's nurse aides had been trained and certified at the facility.

On September 22 and 23 1997, members of a DHMH survey team (referred to by the parties as "surveyors") conducted an unannounced survey of the facility.[7] Based upon the surveyors' findings, DHMH concluded that an extended survey of the facility was warranted. DHMH conducted an extended survey from September 24–26, 1997. As a consequence of the extended survey, by operation of law under the controlling statute and regulations, approval of Ivy Hall's NATCEP was suspended for two years, beginning on October 23, 1997 (the date of the official deficiency notice) and ending on October 23, 1999.[8]

The standard survey was extensive. DHMH surveyed 28 of the 115 residents of the facility. The surveyors reported, *inter alia,* that Ivy Hall was not complying with 42 C.F.R. § 483.25(c), which regulates resident quality of care. Section 483.25 specifies that "each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being." Subsection (c) requires that a "facility must ensure that

---

7. DHMH and HCFA have an agreement pursuant to which DHMH certifies SNFs in Maryland for compliance with the federal standards.

8. Ivy Hall had several weeks in which to close down formally its training program.

(1) a resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable." DHMH found that, in violation of this standard, in 11 of the 28 residents surveyed, the Ivy Hall staff was failing to turn and reposition residents who were at high risk for developing pressure sores. DHMH repeatedly observed residents lying in the same position, over multiple-hour periods, despite notations in the residents' charts that they had been repositioned. Some of the residents had developed pressures sores in the facility.

In addition, the surveyors observed that Ivy Hall was not complying with 42 C.F.R. § 483.10(c)(2) & (3), which specifies how a facility must safeguard and manage residents' funds. DHMH reported that Ivy Hall did not have its petty cash account reconciled, did not have a means of identifying the residents' portion of the account balance, did not furnish quarterly statements of accounts to residents, failed to maintain residents' funds in an interest bearing account and withdrew such funds without proper authorization, and utilized the personal accounts of six residents "to offset an outstanding cost of care obligation."[9] Ivy Hall has vehemently denied the accuracy of all of these findings throughout the proceedings.

In any event, as a result of these findings, DHMH ordered Ivy Hall to submit a "Plan of Correction" within ten days or civil money penalties would accrue. Ivy Hall promptly submitted its Plan of Correction, which disputed the findings of deficiencies, but in the alternative, also proposed solutions to the reported problems. On January 16, 1998, DHMH notified Ivy Hall that it had resumed substantial compliance with the federal regulations.

In the meantime, an IDR conference was held at Ivy Hall's request on November 14, 1997. Darrell Cammack, the Administrator of Ivy Hall, and members of Ivy Hall staff attended, as did the members of the survey team. Gene Heisler, the Assistant Director of the Licensing and Certification Administration of DHMH presided over the conference. As a result of the conference, DHMH removed the initially listed deficiency related to nutrition and made some clerical alterations to the survey findings. The other findings remained unchanged.

Thus, despite Ivy Hall's prompt return to substantial compliance with federal regulations, as an automatic consequence of DHMH's initial finding (which was not altered in consequence of the IDR conference) that Ivy Hall was providing "substandard quality of care," Ivy Hall's NATCEP was suspended for two years. Thus, Ivy Hall's NATCEP was suspended effective October 23, 1997, and may not resume before October 23, 1999. Ivy Hall claims that it has incurred increased costs of doing business of over $100,000 as a result of this suspension. Ivy Hall filed this action in August 1998.

## III. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith*

---

9. The surveyors also reported that Ivy Hall was not ensuring one resident's proper nutritional status. After the informal dispute resolution process, this deficiency was deleted. Additionally, DHMH found that Ivy Hall was not maintaining proper clinical records. This finding was primarily premised on the records indicating that residents had been repositioned and turned, when according to DHMH they had not. Neither party discusses this finding in its submissions to the court.

*Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. 1348. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy,* 929 F.2d at 1012.

**10.** Ivy Hall actually argues that HCFA has conceded that suspension of the NATCEP af-

## IV. ANALYSIS

### A. Introduction

"The Due Process Clause of the Fourteenth Amendment reduces unfair or mistaken deprivations of individual interests by commanding states to provide persons in jeopardy of loss with certain procedural safeguards." *Mallette v. Arlington County Employees' Supplemental Retirement Sys.,* 91 F.3d 630, 634 (4th Cir.1996). In order to demonstrate that the suspension of the NATCEP violated its constitutional rights, Ivy Hall must establish that it has a liberty or a property interest in running a NATCEP. *See American Manufacturers Mutual Ins. Co. v. Sullivan,* —— U.S. ——, 119 S.Ct. 977, 989, 143 L.Ed.2d 130 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' ") (citations omitted).

### B. Defendants' Procedures Do Not Deprive Ivy Hall of a Liberty Interest Protected by the Due Process Clause

■ Ivy Hall asserts three reasons to support its contention that it possesses a liberty interest in running a NATCEP. First, Ivy Hall suggests that because HCFA stated that "the informal dispute resolution process satisfies essential elements of due process . . . ," *see* 59 Fed.Reg. 56, 229, it has therefore admitted that revocation affects a liberty interest.[10] Contrary to this assertion, however, HCFA's opinion that its procedures comport with due process does not compel the conclusion that the government is bound by an admission that a liberty interest in the NATCEP program is implicated. It merely represents the agency's opinion that the procedures enacted comport with what due process *may* require.

■ Second, Ivy Hall also relies on *Allgeyer v. Louisiana,* 165 U.S. 578, 17 S.Ct.

fects *either* a liberty or a property interest.

427, 41 L.Ed. 832 (1897), for the proposition that it has a liberty interest in running its business free of arbitrary controls. This reliance is misplaced. *Allgeyer* held, *inter alia*, "that a State does not have power to tax contracts of insurance or reinsurance entered into outside its jurisdiction by individuals or corporations resident or domiciled therein covering risks within the State or to regulate such transactions in any way." *State Bd. of Ins. v. Todd Shipyards Corp.*, 370 U.S. 451, 455–56, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962) (discussing *Allgeyer* ) (citing H.R.Rep. No. 143, 79th Cong., 1st Sess. 3, 1945 U.S.C.C.A.N. 670). This reasoning is inapposite to a review of Congress's decision to provide for the automatic revocation of a SNF's NATCEP. Notably, Ivy Hall is still entitled to provide any type of training it desires, it merely will not count towards certification.

■ Third, Ivy Hall argues that its liberty interest has been implicated because it has been accused of immorality in its business. "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard is essential." *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir.1990) (citing *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). However, "liberty interests are not implicated by harm to reputation alone." *Zepp v. Rehrmann*, 79 F.3d 381, 387 (4th Cir. 1996); *see also Paul v. Davis*, 424 U.S. 693, 712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding that damage to petitioner's reputation alone was insufficient to constitute a constitutionally protected liberty interest). Not only must a statement or public charge "imply the existence of serious character defects such as dishonesty or immorality ...," *see Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir.1982), but such statements must be of the type to "seriously damage [the plaintiff's] standing

and associations in his community or foreclose[ ] his freedom to take advantage of other employment opportunities." *Zepp*, 79 F.3d at 388 (citing *Roth*, 408 U.S. at 573, 92 S.Ct. 2701); *Vanelli v. Reynolds Sch. Dist.*, 667 F.2d 773, 777–78 (9th Cir. 1982) ("The procedural protections of due process apply if the accuracy of the charge [which impairs reputation for honesty or morality] is contested, there is some public disclosure of the charge, and it is made in connection with the termination of employment or the alteration of some right or status recognized by state law.").

Thus, to implicate a constitutionally protected liberty interest, the statement or public charge must assail Ivy Hall for its dishonesty or immorality. For example, in *Zepp*, the Fourth Circuit held that plaintiff did not possess a liberty interest in being free from a public statement revealing that he was forced to retire due to management problems, as such a statement merely accused plaintiff of "incompetence or unsatisfactory job performance." *Zepp*, 79 F.3d at 388. *See also Robertson*, 679 F.2d at 1092 (holding that no liberty interest was intruded upon when a public statement was made that plaintiff was fired for incompetence).

■ In this instance, Ivy Hall has not been accused of immorality or moral turpitude. The surveyors' findings revealed that Ivy Hall was not complying with federal regulations. Arguably, this is analogous to a finding of incompetence, but certainly is nothing more hurtful than that. Even a finding that Ivy Hall allegedly mishandled certain residents' funds does not translate into moral misfeasance, justifying recognition of a liberty interest.[11] The charge against Ivy Hall was not that it committed Medicare fraud, nor was it even close to such an accusation. *See e.g., Erickson v. Health and Human Serv.*, 67 F.3d 858, 863 (9th Cir.1995) (plaintiff pro-

---

**11.** The state defendant points out that DHMH's finding with regard to deficient money management merely led to DHMH suggestions as to improved methodology and

was not a component of the "substandard quality of care" assessment that led to the extended survey and the NATCEP revocation.

vider had a liberty interest in the publication of its criminal conviction for Medicare fraud); *Koerpel v. Heckler,* 797 F.2d 858, 865 (10th Cir.1986) (finding a "colorable" constitutional liberty interest implicated by the publication of the provider's exclusion from Medicare participation). *Cf. Rafael Convalescent Hosp. v. Shalala,* No. C. 97–1967 FMS, 1998 WL 196469, *5 (N.D.Cal. April 15, 1998) ("[T]he government's finding of substandard care implicated no liberty interest" because the finding, based on a deficient recreational program, did not "impair Rafael's reputation for honesty or morality"). Because the charge against Ivy Hall was not about dishonesty or moral transgressions, the revocation of the NATCEP does not implicate a liberty interest.

### C. Defendants' Actions Implicate Ivy Hall's Limited Property Interest

■ "To have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. *See also Royster v. Turner,* 774 F.2d 618, 620 (4th Cir.1985) ("[T]o determine the existence of such a legitimate claim of entitlement, we must look to 'existing rules or understandings that stem from an independent source such as state law . . . .' ") (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. 2701), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986); *Mallette,* 91 F.3d at 634 ("[T]o decide whether [plaintiff] has a property interest protected by the Fourteenth Amendment, we must look for an independent source of a 'claim of entitlement.' ").

■ Ivy Hall maintains that it has a property interest in running a NATCEP because HCFA cannot revoke a NATCEP at will.[12] Instead, HCFA can only suspend a facility's NATCEP 1) if the facility was subject to an extended survey; 2) if the facility operated under a waiver; 3) if the facility fails to meet curriculum requirements; 4) if the facility refuses to allow unannounced surveys; or 5) if the facility was assessed a civil money penalty, operated under temporary management, or was denied federal payments. *See supra* at 450. Because HCFA's discretion is constrained, Ivy Hall asserts a property interest in the NATCEP. Moreover, Ivy Hall contends that the benefits it receives from the NATCEP are the reduced costs in running its business and improved patient care, which are concrete property interests.

In contrast, the state and federal defendants contend that Ivy Hall does not have a property interest in its NATCEP. In so contending, defendants first question Ivy Hall's "entitlement" to participate in the Medicare and Medicaid programs in the first instance, suggesting that it enjoys no such entitlement.[13] *See e.g., Erickson,* 67 F.3d at 862 (doctors do not have a property interest in continued participation in Medicare); *Koerpel,* 797 F.2d at 863 (same); *Senape v. Constantino,* 936 F.2d 687, 691 (2d Cir.1991) (holding that there was no property right in continued enrollment as a Medicare provider). Accordingly, defendants argue, if there is no property right to participate in the federal

---

12. Approval of a NATCEP lasts for two year periods. *See* 42 C.F.R. § 483.151(d).

13. The federal defendants also argue that the government can revoke a NATCEP "at will" because an extended survey (resulting in automatic decertification of the NATCEP) can be conducted at the Secretary's discretion. The statute provides at 42 U.S.C.A. § 1395i–3(g)(2)(B) that "each skilled nursing facility which is found, under a standard survey, to have provided substandard quality of care

shall be subject to an extended survey. *Any other facility, may, at the Secretary's or State's discretion, be subject to such an extended survey."* (emphasis added). The latent ambiguity arising from the use of the term "any other facility" renders the phrase susceptible to variable meanings. In any event, I need not explore the outer boundaries of the government's discretion to resolve the case before me, but surely wholly arbitrary action could not be successfully defended.

scheme that is the basis for Ivy Hall's business, there can be no property interest in merely running a training program at such a facility. *But see Ram v. Heckler*, 792 F.2d 444, 447 (4th Cir.1986) ("Ram's expectation of continued participation in the Medicare program is a property interest protected by the due process clause of the fifth Amendment.").

Although defendants acknowledge the controlling effect of *Ram* in the Fourth Circuit, they nevertheless urge this court not to find that Ivy Hall has a property interest in running a NATCEP, relying in part on *Rafael*. In *Rafael*, a California survey team found a nursing home to be providing substandard care to its residents because of a deficient activities program. The *Rafael* court found, *inter alia*, that the nursing home did not have a property interest in conducting a NATCEP because "the limitation on Rafael's freedom to conduct nurse training programs is a bitter pill that Rafael must swallow in order to gain the financial rewards of Medicare and Medicaid participation." *Rafael*, 1998 WL at *6.

■ I am persuaded that, notwithstanding defendants' assertions, Ivy Hall enjoys a limited property interest in the continuation of its NATCEP insofar as an arbitrary termination of the program would impose increased costs upon it in the operation of its SNF. The government having authorized the operation of a certified

training program for two years, it may not revoke Ivy Hall's NATCEP arbitrarily, for no reason. It may only act within certain parameters. This constrained discretion supports Ivy Hall's claim of a property interest. Moreover, Ivy Hall's property interest is appropriately characterized as a continued expectation to run its business at a particular reduced cost absent some minimal level of justification for the loss of that expectation. The government may not, without *some form of process*, interfere with Ivy Hall's legitimate business expectancy. Accordingly, Ivy Hall has demonstrated a property interest, to be sure a limited one, in the continued expectancy of pursuing its business at a reduced cost.[14]

### D. The Process Afforded Ivy Hall Satisfied Due Process Requirements

■ Ivy Hall's possession of a limited property interest in the reduced cost of running its skilled nursing facility entitles it to some form of process—that is, notice and some opportunity to be heard.[15] "Due process is flexible and calls for such procedural protections as the particular situation demands." *Schweiker v. McClure*, 456 U.S. 188, 200, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). In this instance, Ivy Hall was provided an opportunity for an informal dispute resolution conference, which was attended by the survey team,

---

**14.** Ivy Hall's argument that the revocation of its NATCEP constitutes a civil money penalty is unpersuasive. Despite the fact that Ivy Hall has incurred some increased costs in consequence of the revocation of its NATCEP, manifestly, this outcome is easily distinguishable from the imposition of a civil money penalty assessed on a per diem basis as a sanction for noncompliance. Thus, the NATCEP suspension is distinguishable from a civil money penalty, even though, at its most abstract level, they both impose expenditures of money on Ivy Hall. *See e.g.*, 59 Fed.Reg. 56, 176(recognizing that "[t]he prohibition of a NATCEP is predicated on, among other things, the existence of a nurse staffing waiver, the fact that a facility has been subject to an extended or partial extended survey, or the imposition of an adverse action.... The en-

forcement remedies, on the other hand, are the consequences of facility noncompliance once deficiencies have been identified through the survey process. While the disapproval of a NATCEP is automatic when criteria set forth in the Act are met, the imposition of remedies is a matter requiring some discretion on the part of HCFA or the State....."). HCFA's own interpretation of the differences between the delineated sanctions (which are punitive) and the automatic revocation of a NATCEP (which in some ways might be regarded as remedial or rehabilitative) is persuasive.

**15.** The parties do not dispute that Ivy Hall received adequate notice of the revocation of its NATCEP.

Heisler and members of Ivy Hall staff. Ivy Hall concedes that it was permitted to argue that the surveyors' observations were flawed and that the surveyors misunderstood Ivy Hall's procedures.

■ In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court announced that a court must consider the following in determining what process is constitutionally required: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* This test is appropriately applied here.

The first factor to be considered under *Mathews*, Ivy Hall's private interest in running its NATCEP (and its related ability to operate its SNF at reduced cost), weighs minimally in the balance. Ivy Hall's ability to run its skilled nursing facility has not been eliminated, nor has its participation in Medicare or Medicaid been terminated or even threatened. Rather, it complains that the cost of running its business has been increased. Nevertheless, it still provides the same services to its residents, and has remained in compliance with federal regulations. HCFA recognized the limited interest in the reduced cost of running a nursing home because of a NATCEP when it established the informal dispute resolution process as the only means to contest such action. HCFA stated:

> We are limiting the appeals of these matters to the informal dispute resolution because we do not believe that the loss of a NATCEP is a remedy of the same magnitude or type as other statutory remedies for which a more formal appeals mechanism is available. Unlike the case with other remedies, a facility losing its NATCEP will not, on that basis alone, face exclusion from the Medicare or Medicaid programs, nor will it face the same kind of deprivation that is arguably the case with respect to civil money penalties, denial of payment, or the imposition of temporary management.

59 Fed.Reg. 56, 229.

Thus, while government may not—consistent with rudimentary demands of due process—arbitrarily impose increased costs on a business in a competitive environment, a mere marginal increase in the cost of doing business does not rise to the level of deprivation requiring the full panoply of due process protections, including a full-blown adversarial hearing as to which the right to counsel attaches, with subsequent appellate review.

The second factor to consider under *Mathews* is the risk of an "erroneous deprivation" through the procedures used, and the value of any substitute procedure. In the case at bar, any risk of error is *de minimis*. Ivy Hall was essentially provided three opportunities to confront the DHMH surveyors and contest their findings. Two of these opportunities came in the form of the immediate face-to-face, on-site opportunity to observe the survey and to speak with the survey team before the conclusion of the survey. Ivy Hall received an additional opportunity at the IDR conference (preceded by the opportunity to submit written arguments) to challenge or otherwise engage and interact with members of the survey team. As a result of the conference, one deficiency was eliminated in its entirety, strongly suggesting that the procedures were conducive to a meaningful opportunity to be heard. It is not at all clear that alternative procedures—given the judgmental, medical decision-making the underlying factual determinations entail, are likely to produce more "accurate" outcomes.

In respect to alternative procedures, Ivy Hall complains about a few particular aspects of the IDR process. First, it argues that an impartial decision maker did not preside over the conference; that is, it

contends that Heisler was not a neutral fact-finder because he was somehow involved in the survey process. Nevertheless, Ivy Hall has not put forth a scintilla of evidence that Heisler was actually involved in the survey. Ivy Hall relies solely on Cammack's bare allegation that "it is common knowledge" that surveyors take their findings back to DHMH to discuss them with their supervisors and that consequently Heisler approved the findings before they were finalized. This is insufficient.

In any event, it is not invariably critical to due process that a wholly independent decision maker preside over a conference or hearing. *See e.g., Caton Ridge Nursing Home v. Califano,* 447 F.Supp. 1222, 1226–27 (D.Md.1978) ("Even prior involvement with some aspects of the case would not necessarily disqualify the hearing examiner as an appropriate judge [and] the mere fact that the hearing officer is an employee of the agency which investigates and brings the action does not per se disqualify him."), *aff'd,* 596 F.2d 608 (4th Cir.1979); *Boston v. Webb,* 783 F.2d 1163, 1166 (4th Cir.1986) ("The due process requirement of an impartial tribunal is not violated simply because the ultimate decision maker was involved in an earlier stage of investigative or administrative procedures"). Accordingly, in the absence of any evidence impeaching Heisler's impartiality, that Heisler presided over the conference did not deprive Ivy Hall of due process.

Ivy Hall also contends that the IDR process did not satisfy due process because it was denied assistance of counsel. It concedes, however, that due process can be satisfied in an informal hearing without the assistance of counsel. *See e.g., Washington v. Harper,* 494 U.S. 210, 236, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (due process was satisfied at an informal hearing to require a prisoner to take antipsy-chotic medication, even though he was not afforded the right to counsel); *Plumer v. Maryland,* 915 F.2d 927, 931–32 (4th Cir. 1990) (noting that the due process did not require the right to counsel in a license revocation hearing); *Varandani v. Bowen,* 824 F.2d 307, 311 (4th Cir.1987) (upholding an informal pre-Medicare suspension hearing of a provider even though his lawyer was not permitted to speak), *cert. dismissed,* 484 U.S. 1052, 108 S.Ct. 1000, 98 L.Ed.2d 968 (1988).

Ivy Hall emphasizes that without the assistance of counsel, the opportunity to question the surveyors was hollow. To the contrary, a lack of counsel at this type of proceeding does not suggest due process infirmities. At the conference, Ivy Hall was entitled to question the surveyors, the very people who observed the facility, about their findings. Counsel, despite her presumed competence, could do little to buttress Ivy Hall's own familiarity with its resident care procedures and protocols. The main points of contention appear to be why the surveyors marked their observations as a "pattern" or why they found that they constituted "substandard" care. Counsel for Ivy Hall is unlikely to have any greater success in challenging these conclusions than trained medical administrators. *See Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 330, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) ("[I]t is less than crystal clear why lawyers must be available to identify possible errors in medical judgment.").

Ivy Hall asserts that despite the SOM manual, which provided Ivy Hall with an explicit opportunity to challenge the scope and severity of the "substandard quality of care" assessments, it was forbidden to do so. *See* Cammack Supp.Aff. ¶ 9; Butler–Campbell Aff. ¶ 28 (containing identical paragraph as in Cammack's affidavit).[16] *But see* Heisler Aff. ¶ at 9 (stating that he

---

16. Ivy Hall also complains that in its letter to the facility, DHMH did not inform Ivy Hall of the changes to the SOM, as prior to the 1997 revisions, facilities were not permitted to challenge the surveyors' assessments at all. The contents of DHMH's letter to Ivy Hall informing it of the IDR opportunity, however, is not binding authority as to what the IDR procedures are. Ivy Hall had an opportunity to access and to read the current SOM to determine what was available to them at the conference.

did not prevent Ivy Hall from challenging the scope and severity of the surveyors' findings). Ivy Hall's affidavits are conclusory and do not generate a genuine dispute of material fact as to the fairness in the manner in which the IDR conference proceeded.[17]

Ivy Hall's arguments are unpersuasive. They do not establish a likelihood that the procedures used by DHMH and HCFA will lead to erroneous fact finding or legal interpretations. As noted above, Ivy Hall had several opportunities to speak with members of the DHMH survey team about their findings and to correct any misconceptions or mistakes in their observations. Moreover, the lack of counsel and the limit on issues that can be presented do not render the procedures constitutionally infirm. Due process does not require that Ivy Hall *prevail* on its arguments, simply that they be fairly considered.

Finally, *Mathews* requires an inquiry into the "[g]overnment's interest," including an assessment of the additional burdens that substitute procedural requirements would involve. The federal defendants argue that providing a formal adversarial hearing would impose significant burdens on the government. For example, it suggests that "the cumulative effect of pulling professional survey staff away from the field and into full-blown adversarial hearings would have a significant adverse impact on the agencies' ability to protect nursing home residents" through regular and thorough surveys. Def.'s Memo Summ.J. at 27. For example, in 1998, of the 1,614 NAT-CEPs that were suspended, 1,257 of

them were located in nursing homes that did not incur additional penalties. Therefore, IDR was the only mechanism available to challenge the findings in these cases. Thus, it is rational to conclude that diverting surveyors and staff from the task of inspecting facilities, for the purpose of participating in full-blown adversarial hearings would be to detrimental to nursing home residents.

On the other hand, Ivy Hall contends that because the importance of the IDR procedure affects facilities who have faced only the sanction of revocation of a NAT-CEP, and thus, only have IDR available (because other remedies permit a hearing and an administrative appeal), the actual burden imposed on the government would be slight. "The only addition being requested is an impartial decision maker and a little more time to have an attorney cross-examine the surveyors and contest scope and severity." Pl's Reply at 18.[18] Whether Ivy Hall's requests would enhance this process is immaterial. The real question is whether the additional burdens would be justified.

Balancing the *Mathews* factors—the slight property interest Ivy Hall enjoys, the evident fairness and reasonableness of the procedures already provided for, the lack of a substantial risk of erroneous deprivation and the tangible and intangible costs of alternative procedures—makes clear that, as a matter of law, the IDR procedures afforded to Ivy Hall satisfy due process requirements. Therefore, I will grant both defendants' motions for summary judgment as to Ivy Hall's due process claims.[19]

---

**17.** In the letter requesting an informal dispute resolution conference, Cammack points out that he "has evidence to demonstrate that care provided is definitely not substandard ... [and that he has] additional information to dispute deficiencies." Pl.'s Ex. D. Cammack draws DHMH's attention to the Plan of Corrections "for more details regarding disputed deficiencies." *Id.* Thus, there was no impediment to Ivy Hall's efforts to present the evidence and arguments it wanted to present. Had Ivy Hall desired, it easily could have submitted a written brief detailing its argu-

ments in advance of the IDR. Accordingly, Ivy Hall had meaningful opportunities to present its side of the dispute.

**18.** Ivy Hall has offered no evidence beyond the conclusory opinions of its staff that Heisler's impartiality was compromised.

**19.** Because the procedures and regulations comport with due process, Ivy Hall's separate claims against Benjamin, under the Maryland Declaration of Rights and § 1983, fail as a matter of law, as well.

**460**

### E. Ivy Hall Was Not Deprived of Equal Protection in the Loss of Its NATCEP

 Ivy Hall additionally argues (although it appears did not allege in the complaint) that the revocation of the NATCEP does not satisfy even rational basis review and therefore deprives it of equal protection.[20] It concedes that "HCFA's purpose is to encourage compliance with the statutes and regulations that establish standards for skilled nursing facilities [and that] [t]he standards are meant to guarantee the residents of SNF's good care and protection." Pl.'s Memo Summ.J. at 29. Ivy Hall contends, however, that the sanction of revoking a NATCEP treats the "accused the same as the guilty" and is not "rationally related to serving the government's purpose." *Id.* at 30.

Contrary to these assertions, however, it seems apparent that prohibiting the training of nurse aides at an SNF that is found to be providing substandard care, albeit, even for a short duration, is rationally related to ensuring that residents of SNF's receive good care and are protected, and that nurse aides are trained by competent superiors. It would not have been irrational for Congress to have concluded that nurse aide training programs should only be operated by facilities in full compliance with applicable federal laws and regulations intended to insure the delivery of competent and appropriate nursing home services. Therefore, neither the regulations revoking a NATCEP upon a finding of substandard care nor the authorizing statute deprives Ivy Hall of equal protection.

**20.** Because the regulation does not implicate a suspect or even quasi-suspect class, only rational basis review is required. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

**21.** As I have concluded that, as applied to Ivy Hall, the regulatory regime passes constitu-

### V. CONCLUSION

For the reasons set forth above, I will grant the defendants' motions for summary judgment.[21] An order follows.

tional muster, I have no occasion to scrutinize that regime facially. Ivy Hall's insistence that it is entitled constitutionally to judicial review of the substantive decision making leading to the loss of its training program fails as a matter of law, and Ivy Hall has not suggested the existence of any statutory authority for judicial review of the IDR.