Leanna F. YOUNG; Janet Rebecca Crisp; Paul Evington; Scott Alan Gaddy; and Rock S. Edwards, Plaintiffs,

v.

William R. ANNARINO, individually and in his official capacity as Chief of Police for the Asheville Police Department; Leroy Lunsford, individually and in his official capacity as Internal Affairs Officer for the Asheville City Police Department; and the City of Asheville, Defendants.

No. 1:99CV113.

United States District Court, W.D. North Carolina., Asheville Division.

June 21, 2000.

916

Michelle Rippon, Van Winkle, Buck, Wall, Starnes & Davis, P.A., Asheville, NC, for plaintiffs.

Sharon Tracey Barrett, Patla, Straus, Robinson & Moore, Asheville, NC, Robert W. Oast, Jr., Asheville, NC, for defendants.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Plaintiffs' timely filed objections to the Memorandum and Recommendation of United States Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the Defendants' motion for summary judgment to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review of those portions of the recommendation to which specific objections were filed, the undersigned will grant in part and deny in part the Defendants' motion. 28 U.S.C. § 636(b); Fed.R.Civ.P. 72.

## I. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving parties, here the Plaintiffs. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Defendants as the moving parties have the initial burden to show a lack of evidence to support the Plaintiffs' case. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiffs who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiffs]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiffs, as the nonmoving parties. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. STATEMENT OF FACTS

Plaintiffs, all former police officers with the City of Asheville (City), have alleged nine causes of action for violations of 42 U.S.C. §§ 1983 and 1985, state constitutional claims, breach of contract, wrongful discharge, negligent supervision, defamation, wilful and wanton conduct, and civil claims under the Racketeer Influenced and Corrupt Organization Act (RICO). Three of the Plaintiffs resigned after being confronted about improper conduct; the remaining two, who were also confronted about their conduct, availed themselves of the grievance procedures enacted by the City.

Plaintiff Young was last employed as a police officer with the City in October 1997. On three occasions, she wrote and passed worthless checks. On October 31, 1997, Young was dispatched from her patrol to see Defendant Lunsford, Internal Affairs Officer for the Asheville Police Department. **Exhibit 7, Excerpts from the Deposition of Leanna F. Young,** *attached to* **Plaintiffs' Brief in Response to Defendants' Motion for Summary**

Judgment, at 143 ["Plaintiffs' Response"]. She was told an investigation into the third incident was underway and would be completed by the following Monday. *Id.* Lunsford informed Young that if she was terminated, her certification as a law enforcement officer would be eliminated; thus, she was offered the option of resigning. *Id.* Young responded that she had "had enough of this shit" and in sum and substance told Lunsford he could have her badge. **Exhibit 4, Requested Excerpts from Young Deposition, *attached to* Defendants' Motion for Summary Judgment, at 152 ["Defendants' Motion"].** Young had been investigated by the Internal Affairs Division after her first worthless check incident. She concluded that if she did not resign, she would be fired and the resignation had to be given that day. **Exhibit 7, Young Deposition Excerpts, at 169–70.** Young wrote a resignation letter stating she was resigning for personal reasons.

Plaintiff Crisp, who began working as a police officer with the City in 1985, was last employed there in September 1998. At the end of August 1998, she was living with Jonathan Gajdik, the father of her youngest child. Gajdik was employed by the Buncombe County Sheriff's Department. On August 31, 1998, she and Gajdik became embroiled in a domestic dispute during which she reached down and picked up her gun belt in order to throw it out of the way. **Exhibit 5, Excerpts from the Deposition of Janet Rebecca Crisp, *attached to* Defendants' Motion, at 44.** The two began to struggle over the belt and the gun, which obviously had been taken out of the holster by someone, discharged. *Id.,* at 45. Gajdik grabbed their toddler and began to leave the house when Crisp took his service revolver from his belt and threw it on the couch.[1] *Id.* As a result of this incident, Crisp was placed on administrative leave and Gajdik filed for a domestic protection order. On September 8, 1998, she had a meeting with Defendant Annarino and her supervisor during which she was referred to the Employee Assistance Program for counseling and told to stay away from Gajdik. *Id.,* at 60–62. On September 24, 1998, Crisp saw Gajdik with another woman and confronted him in front of witnesses at the Buncombe County Detention Facility. Again, a physical altercation ensued.

Crisp testified that after the September 24 incident, Lunsford told her he would have to refer the matter to the District Attorney unless she resigned.[2] **Exhibit 8, Excerpts from the Crisp Deposition, *attached to* Plaintiffs' Response, at 90.** Lunsford also told her it was possible the Department of Social Services (DSS) would then remove the child from the custody of either parent due to the incident involving the gun. *Id.* However, if she resigned, the investigation would be stopped and there would be no referral to the District Attorney. *Id.* Lunsford had to have an answer by 9:00 a.m. the next day or he would take the matter to the District Attorney. *Id.,* at 91. Crisp was also told that if she resigned, her certification would not be in danger. *Id.,* at 100.

Plaintiff Crisp's father was present during this conversation with Lunsford. He testified that Lunsford said he had a meeting with the District Attorney at 2:00 p.m. that afternoon concerning the domestic altercation. **Exhibit 9, Excerpts from the Deposition of Harold Crisp, *attached to* Plaintiffs' Response, at 12–13.** Lunsford advised that once the District Attorney had the matter, DSS would be called in and the baby was likely to be removed

---

1. Defendants maintain that Crisp then pointed the gun at Gajdik while he was holding the toddler and threatened to "blow his f_____g brains out." When asked if she pointed the gun at Gajdik's head and made such a threat, Crisp testified that she "could have." **Crisp Deposition Excerpts, at 53, 56.**

2. None of the parties have provided the date of this meeting to the Court and the record does not reflect it.

from the custody of both parents. *Id.* This badly upset Plaintiff Crisp who went into the house alone. *Id.* While Crisp's father was speaking with Lunsford, Lunsford admitted that she was going to be fired if she did not resign. *Id.,* at 14–15. Although Lunsford had said he had a meeting that afternoon with the District Attorney, he stayed at Crisp's home until almost 4:00 p.m., and never made a call to cancel the appointment. *Id.,* at 16. Crisp decided to resign due to fears of losing custody of her child.

Plaintiff Evington was an Asheville police officer for almost three years before he resigned in September 1997. One evening while he was on duty, he picked up a woman in his patrol car and took her to a police substation where she performed fellatio on Evington. At first, he was told not to worry about the incident by his immediate supervisor but he later learned that Annarino was very upset about it. **Exhibit 10, Excerpts from the Deposition of Paul Evington, *attached to* Plaintiffs' Response, at 27, 28, 78.** Evington met with Lunsford on September 24, 1997, and the next day, he resigned. **Exhibit 2, Affidavit of Leroy Lunsford, *attached to* Defendants' Motion, at ¶ 13.** Evington testified that during a meeting with Annarino and Lunsford, he was told he could resign or he would be fired. **Evington Deposition Excerpts, *supra.*** Evington asked whether his resignation would allow him to maintain his certification. Annarino responded that he had no influence over the certification. *Id.,* at 79. Evington resigned. In the separation report filed with the North Carolina Department of Justice, Annarino recommended that Evington not be employed elsewhere as a law enforcement officer. **Deposition Exhibit 5, *attached to* Evington Deposition Excerpts.** Annarino also noted that under no circumstances would he consider rehiring Evington. *Id.*

On December 28, 1998, Plaintiff Gaddy was stopped in his personal vehicle by Trooper C.M. Goodson of the North Carolina Highway Patrol for exceeding 75 miles per hour in a 60 miles per hour zone. **Exhibit G, Excerpts from the Deposition of C.M. Goodson, *attached to* Lunsford Affidavit, at 5.** When Goodson stopped Gaddy's vehicle, it was obvious that Gaddy was intoxicated. *Id.,* at 7. In fact, Gaddy was later convicted of level 5 driving while under the influence of alcohol. *Id.,* at 11. As a result of the arrest, an internal affairs investigation was conducted. **Exhibit C, *attached to* Exhibit 3, Affidavit of Will R. Annarino, *attached to* Defendants' Motion.** Gaddy met with Annarino and was provided a notice at that time that the meeting was a pre-disciplinary conference. **Exhibit 11, Excerpts from the Deposition of Scott Alan Gaddy, *attached to* Plaintiffs' Response, at 125.** He was told at the meeting that it would be in his best interests to resign and he would be given a good recommendation. *Id.* However, Gaddy did not believe this based on the experiences of other officers. *Id.* Gaddy chose not to resign and was ultimately terminated. He stated in his deposition that the media attention his arrest received forced Annarino to terminate him; whereas, other officers' misconduct went unpunished due to a lack of such coverage. *Id.,* at 81, 86–87. Gaddy appealed his termination with the Asheville Civil Service Board and the termination was upheld. He then filed an action, still pending, in state court requesting a *de novo* review.

In October 1997, Plaintiff Edwards arrested Thomas Bristol on drug charges and took drugs and $720 in cash from his person.[3] **Exhibit 10, Excerpts from the Deposition of Rock S. Edwards, *attached to* Defendants' Motion, at 115.** Edwards turned the drugs in to the property room at the police department but kept the cash in his patrol car. *Id.,* at

---

**3.** Edwards claimed that despite the removal of the cash from Bristol's person, he did not

"seize" it.

115–17. A few days later, he was called by another officer and asked whether he had taken the cash from Bristol. *Id.,* at 109–10. Edwards first told that officer he had not taken any cash from Bristol and then said that Bristol had only $40 on his person. *Id.,* at 110–11. Edwards was aware that this was a violation of departmental standards. *Id.,* at 118. Edwards testified that the $720 cash belonged to Jessica Hall, to whom he returned the money, and the $40 cash belonged to Bristol. During this time period, Edwards was having financial difficulties. *Id.,* at 189. After an investigation into the incident, Edwards was terminated, a decision which he appealed to the Civil Service Board.

Edwards also testified at the Civil Service Board grievance hearing. At that hearing, however, he testified that he had been unaware that cash removed from an arrestee had to be turned over to the property room. **Exhibit 11, Testimony of Rock Steven Edwards, *attached to* Defendants' Motion, at 191–92.** He kept the $720 cash with him for four days at which point, Jessica Hall called the police station asking to speak with Edwards. *Id.,* at 193–95. Edwards had gone off duty by that time but received the message. *Id.* He testified that he tried to return her call twice but did not receive an answer. *Id.,* at 195. After that, he did not attempt to call her again because she had been informed he would be back on duty four days later. *Id.* In fact, when he returned to work, Hall came down to the police station to get her money which Edwards then delivered to her. The Civil Service Board upheld the decision to terminate Edwards. He received a *de novo* review of this decision in state court which affirmed the Board's decision.

When the North Carolina Department of Justice received the notice of separation, an investigation was begun concerning Edwards' certification as a law enforcement officer. During that investigation, statements were made to Jeff Slagle, the investigating officer of the North Carolina Criminal Justice Education and Training Standards Commission (Commission), concerning an allegation that Edwards had solicited sex from a suspect in exchange for not arresting her. The investigation of the incident, however, was not completed because the woman in question had been admitted to a drug rehabilitation program and was unavailable for interview.

In order for a law enforcement officer to lose his or her certification, the Commission requires proof of convictions for four Class A misdemeanors.[4] **Exhibit 26, Excerpts from the Deposition of Scott Perry, *attached to* Plaintiffs' Response, at 56–57.** A level 5 conviction for driving while under the influence of alcohol is a Class A misdemeanor as is passing a worthless check. *Id.* However, Perry testified that "a lot of officers and people in general think that any kind of DWI conviction gets you—would cause you to lose your certification, but they're just misinformed." *Id.,* at 57.

## III. DISCUSSION

### A. The issue of protected property or liberty interests.

 Plaintiffs' § 1983 claims are based on allegations that they were deprived of their rights to procedural due process. Courts will not entertain an action based on inadequate process unless a plaintiff can show that he or she has a protected liberty interest. *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In order to determine whether the Plaintiffs had a protected liberty interest in continued employment, this Court must apply state law.[5] *Knight v. Vernon,* 214

---

4. No information was provided concerning what other activities or convictions would result in the termination of certification.

5. Plaintiff Edwards does not claim a protected interest in continued employment. His claim is based on defamation occurring during the course of his termination.

F.3d 544, 552 (4th Cir.2000). "North Carolina is an at-will employment state." *Id.*

An employee-at-will can be fired for an irrational reason, no reason, or any reason that does not violate public policy. As such, an employee-at-will does not have a constitutionally protected right to continued employment and does not have the benefit of the protections of procedural due process. An employee whose employment would otherwise be at-will may gain a recognizable interest in continued employment where such a right is granted by ordinance or implied contract. Employee manuals or policy memoranda may form the basis of such a right if they are expressly included in the employee's employment contract, or in the case of local governments, enacted as ordinances.

*Wuchte v. McNeil,* 130 N.C.App. 738, 740–41, 505 S.E.2d 142, 144 (1998) (citations omitted). Plaintiffs object to the Magistrate Judge's conclusion that the City's Personnel Policy has not been adopted as an ordinance and thus, no protected rights arise. They note their position is not based solely on the personnel policy but the Asheville Civil Service Law, 1953 N.C.Sess.Laws, c. 757, as amended; 1977 N.C.Sess.Laws, c. 415; and City of Asheville Ordinance No. 1864. The relevant portions of these laws provide:

Whenever any member of the classified service of the City of Asheville is discharged ... that member shall be entitled to a hearing before the civil service board of the City of Asheville *to determine whether or not the action complained of is justified.*

Any member of the classified service ... who desires such hearing shall file his request for hearing ... within ten days ... but not before such member shall have exhausted his or her remedy *provided by the grievance procedures established by ordinance of the city....*

Exhibit 16 (Related Laws), § 44. Session Laws 1953, ch. 757, § 14; Session Laws 1977, ch. 415, §§ 1–6; Session Laws 1977, ch. 530, § 1(b), *attached to* Defendants' Motion (emphasis added).

■ Ordinance No. 1864 enacted a grievance procedure for city employees and contains the same provisions as those in the City's Personnel Policy for grievances. Section 2–266 of the Ordinance sets forth the policy behind the grievance procedures "that all employees be treated fairly and equitably in all respects." Exhibit 3, Ordinance 1864, *attached to* Plaintiffs' Response. Section 2–227 of the Ordinance defines grievance as a "complaint or dispute of an employee relating to his employment," *Id.* And, § 2–230 provides for a departmental pre-disciplinary conference with an employee before his or her suspension or termination. Exhibit 4, City of Asheville Personnel Policy, *attached to* Plaintiffs' Response, at 33.

A departmental predisciplinary conference shall be afforded any full-time permanent employee whose conduct or performance may result in his involuntary ... dismissal from the city service.... The employee shall be given a minimum of 48 hours' notice of the date, time, location and subject matter of the predisciplinary conference. The notice shall be written and acknowledged as received by the employee....

Exhibit 3, Ordinance 1864, at § 2–230. The language of Ordinance 1864 is virtually identical to that of the City's Personnel Policy which, although not enacted *in toto* as an ordinance, was passed as Resolution 90–129 on the same date that Ordinance 1864 was enacted.

Here, the [Policy], which was also a [city] ordinance, created the reasonable expectation of continued employment within the meaning of the due process clause. The [City's] ordinance, in effect, is comparable to rights given State employees pursuant to N.C.G.S. § 126–35 (1991). That statutory provision *delineates certain procedures relating to grievances and disciplinary actions* with respect to State employees. Cases decided pursuant to N.C.G.S. § 126–35

have held the statute to create a reasonable expectation of employment and a property interest within the meaning of the Due Process Clause. *Howell v. Town of Carolina Beach*, 106 N.C.App. 410, 417, 417 S.E.2d 277, 281 (1992) **(Involving a failure to follow grievance procedures)** (emphasis added); *accord, Soles v. City of Raleigh Civil Service Comm.*, 345 N.C. 443, 447, 480 S.E.2d 685, 687–88 (1997) **(Noting that because personnel policies were not contained in the City's Code of Ordinances, no property interest arose.);** *Knight, supra.*

The undersigned rejects Defendants' argument that these grievance procedures, which they admit have been adopted as an ordinance, are of no moment because they do not codify the right to be terminated only for just cause. In *Howell*, there is no mention that the personnel policy at issue, which had been adopted as an ordinance, provided for dismissal only for just cause. Indeed, the case turned on the town's failure to follow its grievance procedures, including the provision of a hearing. *See also, Paschal v. Myers*, 129 N.C.App. 23, 29, 497 S.E.2d 311, 315 (1998) **("[T]he Employee Handbook, which was also a town ordinance, created the reasonable expectation of continued employment within the meaning of the Due Process Clause." The court made no mention of whether that manual provided for dismissal only for just cause.);** *Vereen v. Holden*, 127 N.C.App. 205, 487 S.E.2d 822 (1997).[6] Here, although the entire personnel policy has not been enacted as an ordinance, that portion of the policy setting out procedures required before an employee may be disciplined or terminated has been so enacted. The undersigned therefore finds this falls within the rulings of North Carolina law that where procedural rights have been enacted by ordi-nance, the employee has a legitimate expectation in continued employment.

■ Plaintiff Edwards claims that disclosures made by Lunsford to Slagle, a field representative of the North Carolina Criminal Justice Education and Training Standards Commission, constituted defamation which deprived him of his protected liberty interest not to have his reputation harmed. As a result of the investigation conducted by Slagle, Edwards' certification as a law enforcement officer was terminated.

■ In order to show that he was deprived of a liberty interest, Edwards must show: (1) the statements made to the investigator were false; (2) the statements were made public; (3) the statements were made in the course of his discharge; and (4) the statements " 'might seriously damage his standing and associations in his community' " or impose " 'a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.' " *Stone v. University of Maryland Medical Sys. Corp.*, 855 F.2d 167, 173 n. 5 (4th Cir.1988) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 573–75, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). "Law enforcement agencies are required to complete a 'Report of Separation' within ten days of an officer's . . . resignation [or] dismissal . . . and forward it to the Criminal Justice Standards Division." *Wuchte*, 130 N.C.App. at 742, 505 S.E.2d at 145. This form was forwarded by the Defendants and it triggered Slagle's investigation. The report itself violated no constitutional rights. *Id.*, at 743–44, 505 S.E.2d at 146. Edwards maintains that disclosures made to Slagle concerning the alleged sexual misconduct, however, did violate his rights.[7]

---

**6.** Defendants' citation to *Woods v. City of Wilmington*, 125 N.C.App. 226, 480 S.E.2d 429 (1997), in support of their argument is misleading. That case does not discuss the issue of just cause.

**7.** Edwards argues that Lunsford told Slagle the department suspected Edwards' retention of the $720 cash was connected to his involvement in a sex scandal. There is no evidence in the record of any such accusations. The only accusation against Edwards involving

"[W]here a state agency *publicly* and falsely accuses a discharged employee of dishonesty, immorality or job related misconduct, considerations of due process demand that the employee be afforded a hearing in order to have an opportunity to refute the accusation and remove the stigma upon his reputation."

*Id.*, at 743, 505 S.E.2d at 146 (quoting *Presnell v. Pell,* 298 N.C. 715, 724, 260 S.E.2d 611, 617 (1979)) (emphasis added). The information provided here was placed in Slagle's Investigative Memorandum; thus, it is questionable that any public disclosure was made. The *Wuchte* court declined to reach this issue, disposing of the case on other grounds. However, the Supreme Court has held that when the reasons for terminating an employee are disclosed at a meeting with the employee but never publicly disclosed, no liberty interest is implicated. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). "Unpublicized accusations do not infringe constitutional liberty interests because, by definition, they cannot harm 'good name, reputation, honor, or integrity.'" *Hodge v. Jones,* 31 F.3d 157, 165 (4th Cir.1994). Nor does the fact that the Defendants "publicized" the information to the Commission constitute publication. *Id.* (Where the information reported to the DSS was required to be kept confidential, no publication occurred.); *Watson v. Lowcountry Red Cross,* 974 F.2d 482, 487–88 (4th Cir.1992) (Remote possibility of public disclosure of confidential medical records does not rise to level of constitutional privacy violation.).

Moreover, the incidents of which Edwards complains were noted in Slagle's report as unsubstantiated. He thus has not shown that the termination of his certification was caused by that information, rather than his termination as an officer. And, while he may no longer work in law enforcement, he is not foreclosed from other employment opportunities. *See e.g., Jackson v. Long,* 102 F.3d 722, 730 (4th Cir.1996). The undersigned therefore agrees with the Magistrate Judge's determination that Plaintiff Edwards has no claim for the violation of a protected liberty interest in his reputation. This disposes of his federal and state constitutional claims.

**B. The issue of procedural due process.**

Having concluded that Plaintiffs Young, Crisp, Evington and Gaddy have protected property interests in their continued employment as police officers, it is necessary to ascertain whether they received procedural due process in connection with their resignations and discharge. Defendants do not dispute that Young, Crisp and Evington did not have pre-disciplinary conferences. Gaddy was provided a notice of pre-disciplinary conference during the conference.[8] None of the Plaintiffs received the 48–hour written notice required by the Ordinance. The Magistrate Judge did not address this issue because he found the Plaintiffs had failed to establish a protected interest in continued employment.

■■■■ If the Plaintiffs voluntarily relinquished their property rights by resigning, then they have not been deprived of due process. *Stone,* 855 F.2d at 173.

> If, on the other hand, [their] "resignation[s]" [were] so involuntary that [they] amounted to [ ] constructive discharges, it must be considered a deprivation by state action triggering the protections of the due process clause. A public employer obviously cannot avoid its constitutional obligation to provide due process by the simple expedient of forcing involuntary "resignations."

*Id.* To ascertain whether the resignation was truly voluntary, courts must look to

---

sex was the unconfirmed report that on one occasion he had failed to arrest a woman in exchange for sex.

**8.** However, Gaddy is considered separately because he did not resign and pursued his administrative appeals.

the totality of the circumstances. *Id.*, at 174.

[R]esignations have been found involuntary, hence, per our analysis, "deprivations" of property, in two circumstances: (1) where obtained by the employer's misrepresentation or deception, and (2) where forced by the employer's duress or coercion. Both obviously involve situations in which the employer's conduct has prevented the employee from making a free and informed choice, hence, in our terms, has effectively deprived the employee of his protected property interest.

Under the "misrepresentation" theory, a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. A misrepresentation is material if it concerns either the consequences of the resignation or the alternative to resignation....

Under the "duress/coercion" theory, a resignation may be found involuntary if on the totality of the circumstances it appears that the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter. Factors to be considered are (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation.... [T]he assessment whether real alternatives were offered must be gauged by an objective standard rather than by the employee's purely subjective evaluation.... Similarly, the mere fact that the choice is between comparably unpleasant alternatives—*e.g.*, resignation or facing disciplinary charges—does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary.

*Id.*, at 174 (citations omitted). With these principles in mind, each Plaintiff's case must be reviewed.

 Young claims both misrepresentation and coercion. The latter is first considered. Young was summoned from patrol to meet with Lunsford who informed her she had once again had a complaint lodged against her concerning a worthless check. In 1996, Young pled guilty to the Class 2 misdemeanor of passing a worthless check. **Exhibit A,** *attached to* **Lunsford Affidavit.** In early October 1997, she was reprimanded for passing worthless checks in excess of $400. **Exhibit B,** *attached to* **Lunsford Affidavit.** Lunsford convinced the payee to withhold prosecution and Young paid the checks. *Id.* A few weeks later, the same payee again complained that Young had passed a worthless check for $169. *Id.* This third incident was the subject of her meeting with Lunsford. She was informed that an investigation had begun which would be completed on the following Monday. Although not clear, it appears she was given this information on the preceding Friday. However, Young felt she had to make a decision on the same day she was confronted. Young's perception that she had to make an immediate decision between resignation and termination is subjective and thus, not the gauge by which the conduct must be measured. *Stone, supra.* The fact that she was told the investigation would be completed on Monday was not *per se* a deadline, although it clearly would have been the first step toward termination if the investigation were negative. Regarding the matter objectively, Young had at least a weekend or longer to consider the choice. Her comment to Lunsford that she had "had enough of this shit" is telling. She was not denied a reasonable time within which to choose. *Id.*

 Moreover, based on that comment, it appears Young herself selected the date of her resignation. *Id.* And, although she did not have the advice of counsel, there is no indication in the record

that she wanted the same. *Id.* It does not appear that she was threatened with criminal prosecution; however, Young as an officer would have been aware of that possibility. Young clearly understood the nature of the choice, *albeit* an unpleasant one; and, she was given an alternative to resignation—the possibility of termination and criminal charges. *Id.* "[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges." *Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir.1995); *accord, Zepp v. Rehrmann,* 79 F.3d 381, 387 (4th Cir.1996) **(Jailer faced with decision to resign or be fired and face litigation against him in his individual capacity as to which the county refused to provide legal representation was not coerced.).**

■ Young also claims Lunsford misrepresented to her that she would lose her certification unless she resigned. The classification of a worthless check conviction depends on the amount involved. N.C.Gen.Stat. § 14–107. Young had a prior conviction for a Class 2 misdemeanor. Scott Perry testified that four Class "A" misdemeanor convictions are required for an officer's certification to be terminated. Young has not pointed to any evidence that Lunsford knew this and Perry also testified to common confusion concerning these issues. *Hargray,* 57 F.3d at 1570–71 **(Plaintiff must show that the employer knew or reasonably should have known that the threatened action could not be substantiated.).** Assuming *arguendo* that Lunsford misrepresented this information to Young, the undersigned cannot find her decision to resign was based on this deception. *Zepp,* 79 F.3d at 386–87. Young's comment that she had "had enough" provides the explanation for her decision. In addition to the 1996 worthless check conviction and the October check incidents, Young was reprimanded and disciplined in February 1997 for failing to report an accident she had in her patrol car. Exhibit B, *attached to* Lunsford Affidavit. She

was warned at the time that she had only one more chance. *Id.* Young has not shown that her decision to resign was based on the certification representation. Nor could she reasonably have relied on that representation as an experienced officer. *Hargray, supra; Zepp, supra.* Young had the ability to ascertain the relevant information concerning certification yet chose to assume Lunsford was correct. *Stone,* 855 F.2d at 176 ("**[A] person of [plaintiff's] experience ... was certainly not justified in resigning on the basis of his superiors' representations about the nature of those requirements without consulting the Bylaws themselves.**").

■ At the time Crisp resigned, she was on administrative leave and her duty weapon had been removed from her possession as a result of the incident in which it was discharged during the struggle with her live-in boyfriend. Moreover, Crisp admitted that during that fracas, it was possible she had removed his service revolver from his belt, pointed it to his head, and threatened to shoot him while he was holding their toddler. She had already had one meeting with Annarino and Lunsford during which she was referred for counseling and told to avoid Gajdik, who had filed a motion for a protective order against her. Yet, she became involved in another altercation with him at, of all places, the Buncombe County Detention Facility in full view of several witnesses. It is not clear when she was called in to meet with Lunsford or whether he simply went to her home to see her. However, she was aware of the impending meeting because she asked her father to be present. In any event, Lunsford arrived at her home in the afternoon and told her he would need a decision by 9:00 a.m. the next day as to whether she would resign. The alternative was that he would present the situation to the local district attorney. That would lead to an investigation into criminal charges and the possibility that DSS would remove her child from her home due to her conduct with the firearm.

It was made clear to Crisp that she would be discharged if she did not resign and she also was told that resignation would save her certification.

Addressing first the issue of misrepresentation, Plaintiff has not alleged or provided any evidence to refute Lunsford's statement concerning certification. Certainly, prosecutions and possible convictions for the discharge of a firearm in a dwelling (in close proximity to a child) and assault would be a serious matter for the Commission. Nor has Plaintiff made any showing that Lunsford was not obligated to disclose her conduct to the district attorney. Crisp has merely assumed that his statements were made to induce her resignation; however, her subjective view is not controlling. *Stone*, 855 F.2d at 174. Crisp has not shown that Lunsford knew or reasonably should have known that the threatened criminal prosecution could not be substantiated. *Hargray*, 57 F.3d at 1570–71. A reasonable officer certainly would have believed there was probable cause to prosecute Crisp. *Id.* Thus, neither the threatened prosecution nor the prospect of losing certification was a misrepresentation.

■ Crisp argues vehemently that Lunsford threatened to have her child removed from her custody in order to coerce her resignation. The alternatives to resignation were the possibilities of criminal prosecution, loss of custody of her child and loss of her law enforcement certification.[9] "Unfortunately for [Crisp], the mere fact that [s]he was forced to choose between ... inherently unpleasant alternatives does not in itself mean that [her] resignation was submitted under duress, absent evidence that [Lunsford] lacked good cause for the threatened criminal proceedings at the time the alternatives were offered." *Id.,* at 1569. Crisp has not

shown that good cause for the threatened proceedings did not exist; indeed, proceedings initiated by Gajdik were already pending.

Crisp clearly understood the nature of the choice and makes no argument to the contrary. She argues that the short period of time given to make her decision was unreasonable. However, shorter periods have been upheld by the Fourth Circuit. *Stone, supra* (**Plaintiff forced to make decision whether to resign during the course of an afternoon.**). Moreover, Crisp cannot in good faith argue that she did not "see the writing on the wall." During her last altercation with Gajdik, witnesses reported she told him if she lost her job, he would lose his job. She was already on administrative leave and her service weapon had been removed from her possession. As an experienced police officer, Crisp certainly knew that an investigation and potential charges against her were possible. *Hargray,* 57 F.3d at 1569; *Zepp, supra.* Although Crisp was not allowed to choose the time for her resignation, the undersigned simply cannot conclude the employer's conduct deprived her of free choice in the matter.

■ Like the plaintiff in *Zepp v. Rehrmann, supra,* Plaintiff Evington was first told not to be concerned about his sexual misconduct while on duty. *Zepp,* 79 F.3d at 384. However, Annarino told Evington that his choice was to resign or be discharged. As previously noted, the alternative presented was not unreasonable. *Stone, supra.* Evington does not dispute that he understood the choice and makes only a weak argument that he was not given sufficient time to make his decision. As with Young and Crisp, Evington certainly was aware that his conduct could be cause for discharge, despite any comments

---

9. The undersigned does not find the statement concerning possible loss of custody to be coercive but simply a statement of the factual reality faced by Crisp. Both she and Gajdik were law enforcement officers. Yet, in the course of a domestic altercation, one service revolver was discharged in close proximity to a small child and another was pulled from Gajdik's belt while he was holding that child. Nor did Crisp deny that she aimed that gun at Gajdik's head while he held her child.

to the contrary from his supervisor.[10] *Zepp, supra.* In fact, Evington's main complaint is that other officers guilty of equally offensive conduct were not discharged. However, those incidents, if true, have no bearing on the issue involved here: whether Evington's resignation was voluntary.

Evington's misrepresentation argument is also futile. During the meeting, Annarino told Evington that as Chief, he had no influence over whether the Commission would terminate Evington's certification as a law enforcement officer. Evington takes great umbrage with the fact that on the separation from service form, Annarino noted that he would not recommend Evington for a position elsewhere as a law enforcement officer. This, he claims, shows Annarino did in fact have such influence and thus, his comment was deceptive.

> Law enforcement agencies are required to complete a "Report of Separation" within ten days of an officer's ... resignation ... and forward it to the Criminal Justice Standards Division. In addition to administrative information, such as the officer's name and length of service, the form contains four sections: Reason for Separation, Reason, Employability, and Agency's Additional Comments.

*Wuchte,* 130 N.C.App. at 742, 505 S.E.2d at 145. Annarino checked under "Employability" that Evington was not recommended for other law enforcement work and under "Additional Comments" added that he would not consider Evington for reemployment. Plaintiff has presented nothing more than argument that these comments resulted in the Commission's decision to terminate his certification. *Runnebaum v. NationsBank of Maryland, N.A.,* 123 F.3d 156, 164 (4th Cir.1997) ("[U]nsupported speculation ... **is not enough to defeat a summary judgment motion.**").

Evington also claimed that Lunsford assured him he would not lose his certifica-

tion if he resigned, as opposed to being terminated. For the same reasons stated in connection with the other Plaintiffs, this argument is rejected.

■ Gaddy's due process violation is based on the failure to provide him with 48 hours notice of the pre-disciplinary conference. At the meeting with Lunsford, Gaddy was presented with a notice that it was a pre-disciplinary conference and asked to sign the same. Thereafter, Gaddy was provided, and received, all the process available under both the personnel policy and Ordinance 1864. However, Gaddy complains that this cannot cure the original procedural defect.

> [A] public employee with a property interest in continued employment who is given post-termination administrative procedures must nevertheless, before termination, be given "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." When post-termination administrative procedures are afforded, such pretermination procedure functions only as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." The pretermination process need not resolve the propriety of the discharge.

*Linton v. Frederick County Bd. of County Com'rs,* 964 F.2d 1436, 1439 (4th Cir.1992) (quoting *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487) (other citations omitted). In *Linton,* the employee was confronted with a Notice of Dismissal upon his return from a two week vacation. He was told of the charges against him and was given the option of resignation in lieu of termination and was allowed to consider his decision overnight. The Fourth Circuit found he had received adequate pre-termination notice.

---

10. There is no issue raised concerning Evington's choice of a date for resignation.

The facts of *Linton* are almost identical to Gaddy's, except that Linton chose to resign and Gaddy opted to be terminated. Both received the full panoply of post-termination procedures rights. The undersigned can perceive no distinction between the cases and concludes that despite the fact that Gaddy did not receive 48 hours notice of the pre-disciplinary conference, he received oral and/or written notice of the charges against him, an explanation of the employer's evidence, and a chance to present his side of the story. *Id.; Dennison v. County of Frederick, Va.,* 921 F.2d 50, 55 (4th Cir.1990) **(During unscheduled performance evaluation, plaintiff decided to resign; court held he received adequate pre-termination notice.);** *Simons v. West Virginia University,* 85 F.3d 617 (table), 1996 WL 228617, *5 (4th Cir.1996) **(Professor suspended while grievance under consideration not deprived of pre-termination due process).** Thus, Gaddy's claim is dismissed as well.

The resolution of Plaintiffs' § 1983 claims in favor of the Defendants is also dispositive of their conspiracy claims. Those claims, therefore, will also be dismissed.

## C. State constitutional claims.

Plaintiffs object to the dismissal of their state constitutional claims. The Magistrate Judge found they should be dismissed for the same reasons as the federal claims. Plaintiffs' objection states merely that there is sufficient evidence to support their federal due process claims, and thus, the state claims should also survive. For the same reasons the federal claims are dismissed herein, the undersigned will dismiss the state constitutional claims.

## D. The RICO claims.

Plaintiffs' RICO claims are based on the theory that Annarino and Lunsford used extortion in the form of threats and fear to deprive them of their property rights in continued employment. Plaintiffs' object to the Magistrate Judge's conclusion that threats to discharge and fear of losing certification do not amount to predicate acts under RICO.

Section 1962(c) of Title 18, United States Code, provides a civil cause of action for a plaintiff who can show that each

> RICO defendant conducted an enterprise through a pattern of racketeering activity and that [the plaintiff] was injured in [his or her] ... property as the result of such conduct.... Initially, [a plaintiff] must show an enterprise, which is defined as an ongoing organization, formal or informal, in which the various associates function as a continuing unit.... To demonstrate a pattern of racketeering activity under § 1962(c), [a plaintiff] must prove that, at a minimum, each RICO defendant committed two acts of racketeering activity within a ten year period. The predicate acts must be related and must amount to or pose a threat of continued criminal activity.

*Palmetto State Medical Ctr., Inc. v. Operation Lifeline,* 117 F.3d 142, 148 (4th Cir. 1997) **(citations omitted).** Plaintiffs argue that Annarino and Lunsford extorted property rights from police officers who were forced to resign in order to maintain their law enforcement certifications. Each time this occurred, a predicate act occurred.

 "Under the Hobbs Act, 18 U.S.C. § 1951, '[e]xtortion' is defined as 'the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear.' The 'fear' may be of economic loss as well as of physical harm." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 503 (3rd Cir.1998). The undersigned has concluded that three of the Plaintiffs voluntarily resigned; thus, no extortion could have occurred. *Chisolm v. TranSouth Financial Corp.,* 95 F.3d 331, 336 (4th Cir.1996) **("[I]n order to recover damages in a civil [RICO] action, a person [must] be injured in his business or property 'by reason of' a § 1962 viola-**

tion."). And, as to Gaddy, he did not resign; he was terminated and thus, the extortion theory does not hold. *Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) **(Employees who are terminated for refusing to participate in RICO activities or who threaten to report the same do not have standing to sue under RICO for damages from loss of employment.).**

Additionally, a more fundamental fact defeats Plaintiffs' RICO claims. Each of the Plaintiffs admits that he or she engaged in inappropriate or illegal conduct which warranted disciplinary action and termination by the police department. Thus, it was his or her own conduct which led to the disciplinary action at issue. Therefore, no Plaintiff was injured in his property by reason of a § 1962 violation. *Chisolm, supra.*

The undersigned therefore concludes, on slightly different reasoning than the Magistrate Judge, that the Defendants' motion for summary judgment should be granted.

### IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion for summary judgment is hereby **GRANTED** in part and **DENIED** in part and the action is dismissed as set forth in the Judgment filed herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that the Defendants' motion for summary judgment is **ALLOWED IN PART AND DENIED IN PART;** and

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Plaintiffs' state law claims for breach of contract, wrongful discharge, and negligent supervision are hereby **DISMISSED WITHOUT PREJUDICE;** and

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all of the Plaintiffs' remaining claims are hereby **DISMISSED WITH PREJUDICE.**

### MEMORANDUM AND RECOMMENDATION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the court upon defendants' Motion for Summary Judgment. After careful consideration of that motion and review of the pleadings, the undersigned enters the following findings, conclusions, and recommendation.

### FINDINGS AND CONCLUSIONS

#### I. Background

In this action, plaintiffs are former City of Asheville police officers whose employment as officers ended, by termination or resignation, after they committed criminal offenses. While admitting that they committed the underlying criminal acts, plaintiffs contend that their terminations and resignations were in violation of their rights to due process, were the result of racketeering activities on the part of the Chief of Police and the City of Asheville, and amounted to torts actionable under state common law. Defendants have moved for summary judgment, and the issues have been fully briefed.

#### II. Rule 56 Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must

come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.,* at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

> [T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole,* 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits filed in support of defendants' Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir.1979).

## III. Factual Findings

### A. Introduction

As noted above, plaintiffs are five former police officers who were employed by the City of Asheville. Three of the five resigned when confronted by the Chief of Police about their underlying criminal conduct. The remaining two availed themselves of hearings before a city civil service board, appealed the decisions upholding their terminations, and ultimately lost. As discussed below, plaintiffs' ability to maintain their Section 1983 action is dependent upon a finding that they had a property interest in their city employment. In order to maintain claims under RICO, plaintiffs have to show a pattern of racketeering activity and also a business loss. Inasmuch as the specific underlying crimes and circumstances surrounding each plaintiff's claims are distinct, the facts will be summarized as to each plaintiff *seriatim.*

Plaintiffs have devoted a large portion of their memorandum of law to what may best be termed as hearsay evidence concerning the alleged misconduct of other members of the Asheville Police Department. These alleged facts have not been taken as true, and the undersigned will not lend credence to such speculative assertions by repeating them herein, mainly because they are not material to the issues now before the court. Plaintiffs' primary claims are for violation of their rights to due process under the North Carolina and United States constitutions. Determining whether due process is violated is a two-step process, which does not include consideration of alleged wrongful acts of others or the severity of punishment they received:

> (1) plaintiffs must show a protected property interest; and
>
> (2) plaintiffs must then show the process they received was inadequate.

*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Whether others received "better" process or more favorable results from the process is simply not relevant to any portion of the Section 1983 analysis

and, for that matter, is not relevant to plaintiffs' RICO claims.

Ultimately, due process, if applicable, is notice and opportunity to be heard. Whether a person was terminated, demoted, reprimanded, or rewarded is *not* relevant. Disparate-treatment analysis was developed and is useful in Title VII discrimination claims, but has no relevance to Section 1983 due-process claims.

As the state appellate court found in *Wuchte v. McNeil*, 130 N.C.App. 738, 505 S.E.2d 142 (1998), the "dispute regarding the events leading up to . . . dismissal" are "not material." *Id.*, at 739, 505 S.E.2d 142. On summary judgment, plaintiffs must first establish a property interest in their city employment and then show that the process *they* received was inadequate. While the process others may have received may be a fact in dispute, it is neither genuine nor material because it is not pertinent to the inquiries under Section 1983 or RICO. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson, supra,* at 248, 106 S.Ct. 2505.

## B. Leanna Young

Plaintiff Leanna Young resigned her job as an Asheville police officer on October 31, 1997, by submitting a handwritten letter of resignation to the Asheville Police Department. Young resigned shortly after she was told by Internal Affairs Investigator Leroy Lunsford that he had received a complaint relating to a worthless check in the amount of $154.74, which Young had written for her electric bill.

A few weeks earlier, Lunsford had spoken with Young about another complaint he had received from her landlord relating to other worthless checks totaling $400 for payment of her monthly lot rent and trailer rent. Young had faced serious financial problems for months, and they had led to the repossession of her car and ongoing difficulties in paying her bills.

Young knew what to expect from the impending Internal Affairs investigation. In May of 1996 she had delivered a worthless check for $154.36 to the Seven Seas Inn located in Kure Beach, North Carolina. When the Asheville Police Department served an arrest warrant on Young in July 1996, Lunsford investigated. Young admitted the offense and promised it would not happen again. After the investigation, Police Chief Annarino reprimanded Young, required her to send a written apology to the Inn, and suspended her for one day. He also made clear to her that such conduct should not be repeated.

In March 1997, another Internal Affairs investigation was conducted concerning Young's failure to report a motor vehicle accident she had while driving her patrol car. After that investigation, Annarino suspended her for 50 hours and directed her to pay all damages from the accident. He also warned: "You have heard the saying 'three strikes and you are out'. You have been given two chances. I hope, like I have discussed with you before, that you learn from this situation. . . ."

When Young learned on October 31, 1997, that she was facing another Internal Affairs investigation for worthless checks, she told Lunsford, "I have had enough of this shit." Saying that she was going to resign her job rather than face another investigation, she wrote out a letter of resignation on the spot and submitted it to the Asheville Police Department.

## C. Janet Crisp

Plaintiff Janet Crisp resigned her position as an Asheville police officer on September 29, 1998, by submitting to the Asheville Police Department a letter of resignation she had typed. She also signed and submitted another letter of resignation that was typed for her by someone else.

Crisp resigned during an Internal Affairs investigation about reports that she assaulted another law enforcement officer

on two separate occasions. Both incidents involved physical altercations that Crisp admittedly had with Buncombe County Sheriff's Deputy Jonathan Gajdik, her former boyfriend and the father of her youngest child.

The first report related to a fight Crisp had with Deputy Gajdik on August 30, 1998, at her home. According to Crisp, an argument that began in the back yard escalated to a physical struggle in the bedroom when Crisp reached for her duty weapon. The couple wrestled for the gun, and it discharged. Deputy Gajdik then went into the next room, scooped up his two-year-old daughter, and attempted to leave the house. To prevent him from leaving, Crisp grabbed Deputy Gajdik's duty weapon out of the back of his pants, pointed it at his head, and threatened to "blow [his] fucking brains out" if he left the house.

After this incident, Crisp's police powers were suspended, and she turned in her duty weapon. Deputy Gajdik filed a Motion for a Domestic Violence Protective Order. Crisp was placed on administrative leave and referred for counseling and a professional evaluation of her fitness for duty. She was also ordered by Chief Annarino to stay away from Deputy Gajdik.

On September 8, 1998, Crisp met with Annarino and her patrol captain. During that meeting, she admitted that she had a domestic dispute with Deputy Gajdik, but denied that her weapon had discharged. In later statements, she admitted that she lied and admitted that the gun had discharged.

The second report related to a physical altercation Crisp had with Deputy Gajdik on September 24, 1998. According to Crisp, she was in her car and on the way to the bank when she spied Deputy Gajdik in a car with another woman, although he had told Crisp earlier in the day that he was sick. She followed the car around the block until it stopped in front of the Buncombe County Detention Center. Crisp then pulled her car so close to the other

vehicle that they came in contact as Deputy Gajdik tried to open the front passenger door to get out. After he got out of the car and the woman drove away, Crisp got out of her car, began yelling and grabbing at Deputy Gajdik, and followed him up the sidewalk into the Detention Center. Once inside, Crisp continued to push and shove Deputy Gajdik, who kept asking her to leave him alone. She grabbed things off his duty belt and tossed his radio into a trash can. According to witnesses, Crisp told Deputy Gajdik words to the effect of "I am going to lose my job over this and if I do you will lose, too."

### D. Paul Evington

Plaintiff Paul Evington resigned his job as an Asheville police officer on September 24, 1997, by submitting a signed letter of resignation to the Asheville Police Department. Evington resigned the day after Defendant Lunsford told him that a woman whom Evington had encountered on patrol was making allegations of inappropriate conduct.

During an interview Evington had with Lunsford on September 23, 1997, and in his written statement submitted later that day, Evington admitted the following misconduct. A few weeks earlier, while Evington was on duty in uniform in his patrol car at approximately 5:00 a.m., a woman who was standing on a downtown street corner flagged him down. The woman asked him to give her a ride to meet some friends, and he agreed to do so. In his deposition, he explained why he agreed to this request, saying that it was his duty as an Asheville police officer to "protect and serve" the public.

During the trip, she made suggestive statements of a sexual nature, so Evington took her to the Asheville Police Department's substation on Livingston Street, which was unoccupied at that hour. They went to an empty office, where the woman performed oral sex upon Evington. Afterwards, she asked him for $3.00, which he

gave her before dropping her off at the corner of South French Broad and Hilliard Streets in downtown Asheville.

### E. Scott Gaddy

Plaintiff Scott Alan Gaddy was terminated from his job on January 29, 1999, because he committed the criminal offense of driving under the influence of alcohol. As an Asheville police officer, Gaddy had been assigned for several years to the Department's "STEP" unit, which specialized in the enforcement of traffic laws, including driving while impaired ("DWI").

On Saturday, December 29, 1998, State Trooper C.M. Goodson stopped Gaddy on Interstate 40 for speeding. At that time, Trooper Goodson detected the odor of alcohol about Gaddy. Gaddy admits that he had consumed between 6 and 8 beers over a 3–hour period before he drove his car. His blood alcohol content was .11. Although Gaddy asked Trooper Goodson not to arrest him because he knew it could cost him his job at the Asheville Police Department, he was arrested and charged with DWI. Later, he was convicted in state district court for DWI and for speeding 75 miles per hour in a 60–miles–per–hour zone. He did not appeal those convictions.

Lunsford conducted an Internal Affairs investigation concerning these crimes. Gaddy admitted the charges against him in a statement to Lunsford and again to Annarino at his predisciplinary conference on January 21, 1999. He was offered the opportunity to submit his resignation, but declined, and Annarino terminated him on January 29, 1999. Gaddy appealed his termination, and a full evidentiary hearing was conducted before the Asheville Civil Service Board pursuant to the Asheville Civil Service law. The Civil Service Board upheld the termination, and Gaddy filed a civil action in state superior court requesting a review of the Board's decision. That case is still pending.

### F. Rock Edwards

In October 1997, Rock Edwards arrested a suspect on a drug charge. Although Edwards found both drugs and money on the suspect, he only turned in the drugs to the property room at the police department. Edwards kept the cash—an amount in excess of $700—in his possession.

Several days later, when a fellow police officer called Edwards to ask about the money, Edwards denied seizing any money from the suspect. Seven days after the arrest, when the suspect's girlfriend came to police headquarters demanding the money, Edwards gave her $720 in cash. An Internal Affairs investigation ensued, during which Edwards lied to Annarino and Lunsford about a property sheet he filled out for the cash. Later, he admitted that he had lied.

During 1997, Plaintiff Edwards experienced financial difficulties and had not made his car payments. His wife's car was repossessed some time earlier that year, and his own car was repossessed in November 1997, shortly before he was fired. Six months later, he filed for bankruptcy.

After the Internal Affairs investigation was concluded, Annarino fired Edwards. Edwards appealed, and a full evidentiary hearing was conducted before the Civil Service Board. Both Edwards and the City were represented by counsel at the hearing, which included testimony from eight witnesses and the admission of 54 documentary exhibits. The Civil Service Board upheld the termination. Edwards then filed a civil action in the state superior court requesting a review of the Board's decision. Honorable Ronald K. Payne, North Carolina Superior Court Judge, dismissed that case on September 3, 1998.

After Edwards was fired, the City received a request for information from the Criminal Justice Standards Commission of the North Carolina Department of Justice. The requested information concerning Ed-

wards was provided by Defendant Lunsford on behalf of the City in recognition of the Commission's authority to investigate possible violations of Commission rules. N.C.A.C. 9A.0201, *et · seq.;* N.C.Gen.Stat. § 160A–168(c)(5). The Commission revoked Edwards's law-enforcement certification, and Edwards appealed. A full evidentiary hearing was held on April 8, 1999, before Administrative Law Judge Samuel Chess, Jr., who upheld the revocation of Edwards's certification. On appeal of that decision, the Full Commission upheld Judge Chess. Edwards recently abandoned any further appeal of the decision by dismissing his Petition for Review.

### G. The Conduct of William R. Annarino and Leroy Lunsford

In their responsive brief, plaintiffs state that it is not their misconduct which is at issue in this suit, but the alleged misconduct of Defendants Annarino and Lunsford in securing plaintiffs' terminations. Plaintiffs contend that federal and state constitutional rights were violated when Defendants Annarino and Lunsford took actions to induce plaintiffs Young, Crisp, and Evington to resign their employment and did so without according them their rights to a pre-disciplinary conference, as mandated by City of Asheville Ordinance No. 1864. These plaintiffs also allege that their resignations were secured through threats and misstatements made by defendants.

Plaintiff Gaddy alleges that he was terminated from his employment following a pre-disciplinary conference of which he was not given the notice mandated by City of Asheville Ordinance No. 1864. Plaintiff Edwards alleges that in connection with his termination as a law enforcement officer, the defendants published defamatory statements about him.

The complaint also includes state-law claims for breach of contract, libel and slander, negligent retention, and wrongful discharge.

### IV. Procedural and Substantive Due Process Claims Under the United States and North Carolina Constitutions

#### 1. Introduction

Plaintiffs contend that their rights secured under the fourteenth amendment were violated by defendants, who allegedly failed to afford plaintiffs due process in securing their resignations or in terminating their employment. Plaintiffs' claims will be addressed in the context of both procedural and substantive due process.

#### 2. Procedural Due Process

■■■ Due process usually requires a pre-deprivation hearing where the loss of property or liberty results from established state procedures. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). A pre-deprivation process cannot reasonably be required, however, where loss results from a random, unauthorized act of an employee who is a state actor, *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); in which event due process is satisfied by the availability of adequate state post-deprivation remedies, *Parratt,* at 541, 101 S.Ct. 1908. The analysis turns on whether the alleged deprivation is foreseeable and will occur at a predictable point, such that pre-deprivation safeguards would be of use in preventing the kind of deprivation alleged. *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Fields v. Durham,* 909 F.2d 94 (4th Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991). Where these requirements are met, and where the deprivation was effected by an employee authorized to effect such deprivation and responsible for initiating procedural safeguards, the *Parratt* rule has no application. *Zinermon v. Burch, supra,* at 136–38, 110 S.Ct. 975.

### 3. Substantive Due Process

A substantive due-process violation generally requires a showing of conduct that shocks the conscience. *Rochin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Such a violation will be found only where an abuse of governmental power is so egregious or outrageous that no state post-deprivation remedy is adequate to preserve the constitutional guarantees of freedom from such conduct, regardless of the procedures afforded. *Temkin v. Frederick County Comm'rs,* 945 F.2d 716 (4th Cir. 1991), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992).

In this case, plaintiffs appear to contend that substantive due process was violated because Defendant Annarino secured the resignations in lieu of termination through use of threats and misstatements and that such behavior shocks the conscience. The Supreme Court, however, has held, as follows:

> Where a particular amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims."

*Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Substantive due process does not come into play where a plaintiff's claim is rooted in an "explicit textual source of constitutional protection." *Id.*

### 4. Discussion

The linchpin to plaintiffs' due-process claims is whether plaintiffs had protectable property interests in continued employment with the City of Asheville. *Wuchte v. McNeil, supra; Cleveland Bd. of Educ. v. Loudermill, supra; Soles v. City of Raleigh Civil Service Comm.,* 345 N.C. 443, 480 S.E.2d 685, *reh'g denied,* 345 N.C. 761, 485 S.E.2d 299 (1997). In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held, as follows:

> [In order to possess a property interest in public employment,] a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.,* at 577, 92 S.Ct. 2701. While a property interest in employment can be created by statute, ordinance, or express or implied contract, "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood, supra,* at 344, 96 S.Ct. 2074. Where procedural rights are created by a municipality, those procedural rights, standing alone, do not, in and of themselves, create substantive property rights protected by the fourteenth amendment. *Cleveland Bd. of Educ. v. Loudermill, supra,* at 541, 105 S.Ct. 1487 (" 'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty"). *See Beckham v. Harris,* 756 F.2d 1032, 1037 n. 8 (4th Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 231 (1985) (disciplinary guidelines in department personnel manual that an employee could be fired only for violation of specified conduct was insufficient to establish a property interest in continued employment).

In North Carolina, employment is presumed to be "at-will," absent a contract establishing a definite period of employment, a statute, or an ordinance restricting an employee's discharge. *Pittman v. Wilson County,* 839 F.2d 225, 227 (4th Cir. 1988).

In this case, plaintiffs have tendered enabling legislation adopted by the North Carolina General Assembly, which created the Asheville Civil Service Department. The enabling legislation provides that the Civil Service Board will create rules and procedures in which an employee may be discharged or reduced in rank upon proof

that such action is "justified." Plaintiffs' Ex. 2, 1977 N.C.Sess.Laws, c. 415, §§ 3–4. The City of Asheville has created the "City of Asheville Personnel Policy," which provides that prior to disciplinary action, including termination, employees of the City of Asheville must be afforded a pre-disciplinary conference with notice. Plaintiffs argue that the enabling act, the city ordinance, and the personnel policy, when considered together, create a protectable property interest in continued city employment.

While a few particular policies allowing for a grievance procedure and for pre-disciplinary conferences prior to termination of employment have been enacted as ordinances by the City of Asheville, it is undisputed that the "City of Asheville Personnel Policy" has not been reduced to an ordinance. To determine whether plaintiffs have a property interest in continued employment based upon such acts, ordinances, and manuals, the undersigned has turned to state law. *See Cleveland Bd. of Educ. v. Loudermill, supra,* at 538, 105 S.Ct. 1487.

In *Wuchte v. McNeil, supra,* at 741, 505 S.E.2d 142, the North Carolina Court of Appeals held, as follows:

An employee whose employment would otherwise be at-will may gain a recognizable interest in continued employment where such a right is granted by ordinance or implied contract. Employee manuals or policy memoranda may form the basis of such a right if they are expressly included in the employee's employment contract, or in the case of local governments, enacted as ordinances.

Plaintiff's reliance on the personnel policies discussed above as creating a right to procedural due process is misplaced. Nothing else appearing, unilaterally promulgated employee manuals or personnel memoranda do not create a

property interest in continued employment.

Likewise, in *Walker v. Westinghouse Elec. Corp.,* 77 N.C.App. 253, 259, 335 S.E.2d 79 (1985), *disc. rev. denied,* 315 N.C. 597, 341 S.E.2d 39 (1986), the appellate court found "strong equitable and social policy reasons militating against allowing employers to promulgate for their employees potentially misleading personnel manuals while reserving the right to deviate from them at their own caprice," but found that employers are free to disregard such provisions. In *Howell v. Town of Carolina Beach,* 106 N.C.App. 410, 417, 417 S.E.2d 277 (1992)—a case strikingly similar to this action—a protectable property interest was found where the personnel manual was adopted as an ordinance. Creation of a property right in municipal employment hinges in North Carolina on not just the creation of a personnel policy providing the employee with such expectation, but also the adoption of such policy by the municipality through an ordinance. The court cannot find that the City of Asheville Personnel Policy as a whole, or parts that would create a legitimate expectation of continued municipal employment, have been adopted as an ordinance. Applying North Carolina law to facts presented, the undersigned will recommend that plaintiffs' due-process claims be dismissed with prejudice for lack of a protectable property interest. No substantive due-process claim exists based on this record.

### 5. Edwards's Due–Process Claim Based Upon Defamation

While apparently conceding that his claim for defamation is time-barred, Plaintiff Edwards also argues that the defamation forms a basis for a separate claim of denial of due process, inasmuch as his interest in future employment has been jeopardized by statements made by defendants. He argues that such Section 1983 claim is governed by a three-year period of limitations.[1] Read in a light most favor-

---

1. There is no federal statute of limitations for Section 1983 actions, and state statutes of

able to Plaintiff Edwards, his evidence discloses that the individual defendants made statements to Jeff Slagle, the field representative for the North Carolina Criminal Justice Education and Training Standards Commission. Based upon such statements, Investigator Slagle concluded that the money Plaintiff Edwards withheld from evidence was connected to a sex-for-drugs scheme. Slagle depo., p. 103–04.

A person has a protectable property right in his or her ability to attain employment in the future. Where a state actor deprives a person of such reputational right, notice and an opportunity to be heard are required. *Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Robertson v. Rogers*, 679 F.2d 1090 (4th Cir.1982). The essential elements of a viable due-process claim based upon defamation not only encompass notice and opportunity to respond, but publication and falsity. *See Presnell v. Pell*, 298 N.C. 715, 724, 260 S.E.2d 611 (1979). Like defamation, a qualified privilege must exist as a defense to the constitutional sibling; otherwise, legitimate governmental interests would be chilled. In this case, defendants are not accused of spreading false accusations to the news media. *See Jackson v. Long*, 102 F.3d 722 (4th Cir. 1996). Rather, the alleged act of defamation was in responding to a lawful inquiry made by the North Carolina Criminal Justice Education and Training Standards Commission. A qualified privilege to defamation exists where there is shown "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a proper manner and the proper parties only." *Lee v. Lyerly*, 120 N.C.App. 250, 461 S.E.2d 775 (1995); *Averitt v. Rozier*, 119 N.C.App. 216, 458 S.E.2d 26 (1995). The allegedly

slanderous statements by defendants were made in response to the Standards Commission and only upon the Commission's request made pursuant to its legal duty to regulate and certify police officers. To the extent Edwards is arguing that he was not afforded notice and an opportunity to object to the statements made in response to such inquiry, his complaint is with the State of North Carolina, because it is the Standards Commission's investigation, not the city's, and the parameters of such investigation and conclusions therefrom drawn by the Commission are governed by state law, not city ordinance. Finally, Edwards has presented no evidence that the statements were untrue.

## V. North Carolina Law–of–the–Land Claims

Plaintiffs have also alleged claims for violation of due-process guarantees afforded under the North Carolina Constitution's "Law–of–the–Land" provisions. Those rights are coextensive with federal rights to due process, and the undersigned will recommend that summary judgment be granted to defendants on such claims for the same reasons as it was recommended as to the federal due-process claims.

## VI. RICO Claims

On defendants' Motion for Summary Judgment, plaintiffs' burden is to show that each defendant conducted an enterprise through a pattern of racketeering activity and that plaintiffs were injured in their business or property as a proximate result of such conduct. *Palmetto State Medical Center, Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir.1997). Plaintiffs allege that their resignations and termi-

---

limitations apply. *Burnett v. Grattan*, 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). State statutes governing personal injury apply to all Section 1983 claims, *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); and where multiple limitations periods exist for personal injuries (such as in North Carolina) the general or

residual period applies, *Owens v. Okure*, 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989), which is three years. N.C.Gen.Stat. § 1–52(5); *National Advertising Co. v. City of Raleigh*, 947 F.2d 1158 (4th Cir.1991), *cert. denied*, 504 U.S. 931, 112 S.Ct. 1997, 118 L.Ed.2d 593 (1992).

nations were procured through extortion violative of the Hobbs Act—18, United States Code, Section 1951. Under the Hobbs Act, extortion is defined as the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. 18 U.S.C. § 1951(b)(2). As discussed above, plaintiffs have no property interest in continued employment, and such claim must fail as a matter of law.

Even if plaintiffs could show injury to their business or property, they have failed to show a pattern of racketeering activity. To maintain a RICO action, plaintiffs must allege predicate offenses amounting to or threatening racketeering activity over a substantial period of time and that such predicate acts show continuity of racketeering activity. RICO prohibits participation in or benefit from enterprises involving "a pattern of racketeering activity." 18 U.S.C. §§ 1961, *et seq.*

The determination of what constitutes a pattern of racketeering activity is "commonsensical, not formulaic." *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989). In order to allege a "pattern" of racketeering activity, a plaintiff must allege a "continuity" of racketeering offenses, *H.J. Inc. v. Northwestern Bell,* 492 U.S. 229, 239–42, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); and in turn, continuity is properly alleged through predicate acts that either amount to or threaten long-term racketeering activity, *id.,* at 240–41, 109 S.Ct. 2893. The requirement of continuity is a reflection of the harm which Congress intended to address—long-term criminal conduct. Five factors are used to determine whether sufficient continuity has been alleged:

(1) the number and variety of predicate acts;

(2) the length of time over which they were committed;

(3) the number of putative victims;

(4) the presence of separate schemes; and

(5) the potential for multiple distinct injuries.

*Parcoil Corp. v. NOWSCO Well Service, Ltd.,* 887 F.2d 502, 504 (4th Cir.1989). "Closed-ended" continuity is where a series of related racketeering offenses extend over a substantial period of time. *H.J. Inc. v. Northwestern Bell, supra,* at 240–41, 109 S.Ct. 2893. "Open-ended" continuity requires racketeering offenses that, by their very nature, threaten repetition or continuation of racketeering activity over a substantial period. *Id.* Current case law provides that anything less than a year is generally not a "substantial period of time" demonstrating continuity.

> Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this [continuity] requirement. . . .

*Id.,* at 242, 109 S.Ct. 2893.

In this case, plaintiffs have attempted to establish a RICO claim by alleging a pattern or practice of predicate acts that would be violative of the Hobbs Act. They, however, have presented no evidence that defendants committed such acts of alleged "extortion" for personal gain. Instead, through a recitation of mostly hearsay allegations lodged against fellow officers, plaintiffs have attempted to show disparate treatment. Read in a light most favorable to plaintiffs, they present evidence that they were treated differently by defendants because they failed to curry favor with the Chief and that their resignations were secured with threats and misstatements.

The undersigned has taken as true the factual allegations of the complaint, but not the legal conclusions that the acts alleged are predicate offenses. Plaintiffs' concept that a Hobbs Act violation—extortion—can occur where an employer offers the option of resignation in lieu of termination, is troubling to the undersigned. Without doubt, plaintiffs have shown that defendants could summon enormous pressure to secure a resignation. In *United*

*States v. Dowdy,* 479 F.2d 213 (4th Cir.), *cert. denied,* 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973), the Court of Appeals for the Fourth Circuit held, as follows:

> We reject defendant's argument that ... consent was not freely and voluntarily given since it was extended under the pressure of a potential indictment and in return for a promise of immunity.

*Id.,* at 229. A waiver of rights may be voluntary even where it was given under tremendous pressure. In this case, plaintiffs were police officers supposedly trained in dealing with stressful situations and pressure. It's a hard argument to make that these officers did not know what rights they had in regards to their jobs and their police certification. The undersigned cannot find that the personnel actions taken in these matters amount to predicate extortion offenses under the Hobbs Act.

Finally, plaintiffs' burden is to come forward with evidence of "a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell, supra,* at 239, 109 S.Ct. 2893. At most, plaintiffs have shown that defendants were not evenhanded in meting out discipline. The undersigned, however, cannot find that continued *criminal* racketeering activity has either been alleged or shown. Unlike the multiple schemes—gaming, prostitution, theft, and strong-arm extortion—in which corrupt organizations invest their efforts that would be necessary to provide the economic fuel to keep traditional corrupt organizations going, plaintiffs herein have alleged that defendants have engaged in only one scheme—to terminate plaintiffs' employment as Asheville police officers. One scheme has been alleged; other factors discussed above do not appear to be relevant.

Having conducted both a qualitative and quantitative analysis of the factors, the undersigned concludes that plaintiffs have not alleged predicate offenses amounting to or threatening racketeering activity over a substantial period of time. The predicate acts plaintiffs allege are insufficient to show continuity of racketeering activity. As discussed above, this court has real concerns that plaintiffs' factual proffer would even allege predicate offenses. Putting such doubt aside, the undersigned concludes that the evidence presented does not raise the specter of future racketeering activities RICO was intended to quash. All factors point to a conclusion that neither the predicate acts nor the duration and continuity of the scheme implicate the narrow category of organized, ongoing criminal conduct which RICO was designed to fight. For such reasons, the undersigned will recommend that plaintiffs' federal RICO claims be dismissed. Inasmuch as federal RICO is coextensive with North Carolina RICO, the same recommendation would apply equally to the state RICO claim

## VII. Ties to Organized Crime Under North Carolina RICO

In the event the district court rejects such recommendation, the undersigned has also considered defendants' arguments as to whether an allegation of ties to organized crime is required under North Carolina law.

Defendants argue that North Carolina RICO was intended to apply to entities engaged in or tied to organized crime. Chapter 75D–2(c) of the North Carolina General Statutes provides, in pertinent part, as follows:

> It is not the intent of the General Assembly that [the North Carolina RICO] apply to isolated and unrelated incidents of unlawful conduct but only to an interrelated pattern of organized unlawful activity, the purpose or effect of which is to derive pecuniary gain. Further, it is not the intent of the General Assembly that legitimate business organizations doing business in this State, having no connection to, or any relationship or involvement with organized unlawful elements, groups or activities be subject to suit under the provisions of [the North Carolina RICO].

At the time North Carolina RICO was passed, the General Assembly intended it to mirror federal RICO, and the United States Supreme Court had held that "ties to criminal activity" need not be alleged in order to state a federal civil RICO claim. *H.J., Inc. v. Northwestern Bell, supra,* at 248, 109 S.Ct. 2893. To that end, the undersigned finds that failure to allege a tie to organized crime, in and of itself, is not fatal to an North Carolina RICO claim.

### VIII. Edwards's Defamation Claim

This claim is procedurally barred for Edwards's failure to bring it within the one-year period of limitation. Even if not so barred, defendants have properly pleaded and unequivocally proved qualified privilege, as discussed *supra.* Therefore, the undersigned will recommend that this claim be dismissed.

### IX. Supplemental Claims for Breach of Contract, Libel and Slander, Negligence, and Wrongful Discharge

Where the original jurisdiction of the federal court is invoked, as it was here,

> the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Where the court dismisses all claims over which the court has original jurisdiction, Section 1367(c) provides for dismissal of the supplemental claims in the discretion of the district court. The undersigned would, therefore, recommend that any supplemental state-law claims that remain [2] be dismissed without prejudice as to refiling in an appropriate state forum.

### RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendants' Motion for Summary Judgment be **ALLOWED** in part and **DENIED** in part, as discussed above.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within ten (10) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

This Memorandum and Recommendation is entered in response to defendants' Motion for Summary Judgment (# 13).

April 26, 2000.

---

2. In the interest of judicial economy, the undersigned has made recommendations as to plaintiffs' state constitutional and statutory claims, which are coextensive with the mirror federal claims. In addition, the undersigned has entered a recommendation as to the defamation claim, inasmuch as such claim was substantively addressed in the Section 1983 defamation analysis.